Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Counsel for Defendant Matthew Wilson Moi

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> vs.<br><br>MATTHEW WILSON MOI,<br><br>     Defendant. | Case No.  3:19-cr-00112-TMB-DMS-2<br><br>**DECLARATION OF JAMIE MCGRADY, FEDERAL DEFENDER**<br><br> **(Filed Pursuant to 28 U.S.C. § 1746)** |

I, Jamie McGrady, declare under penalty of perjury that the following is true and accurate to the best of my belief and knowledge:

1.   I am an attorney licensed to practice in Alaska.  I have practiced criminal law exclusively for 14 years and have been licensed for approximately 17 years.  I am the Federal Public Defender for the District of Alaska.  In that capacity, I manage 7 Assistant Federal Defenders and a staff of 13 additional employees.

2.   Since 2012, I have represented hundreds of clients in criminal cases in Alaska federal court.  Many of those individuals were detained in the DOC for—at least—a portion of their cases.  I am actively representing several clients facing federal charges who are currently detained in DOC facilities.

3.	Based upon my professional experience, both in representing clients in DOC custody and in supervising other attorneys doing the same, it is my opinion that, in the majority of instances, attorneys cannot effectively represent in-custody clients unless they are permitted to meet in-person with these clients within the DOC.

4.	As Federal Defender for the District of Alaska, I receive and investigate client complaints about Assistant Federal Defenders as well as Criminal Justice Act Attorneys who are appointed by the federal court for indigent defense. I have observed an increase in client complaints related to communication with their counsel as the pandemic wears on and believe that client dissatisfaction is directly tied to lack of face to face contact with assigned attorneys.

5.	Clients who are prosecuted by the United States Attorney's Office for the District of Alaska are often facing potential sentences that spans years, if not decades, in prison. These clients are not facing 90 days on misdemeanor assault charges. Even those clients with significant criminal histories are particularly concerned when facing the specter of a federal conviction and a period of years in the Bureau of Prisons. Because federal sentences tend to be longer than state sentences, the relationship between a federal attorney and their client is critical to a satisfactory resolution of a federal case.

6.	Many federal prosecutions involve voluminous discovery in the form of wire taps, financial spreadsheets, multi-year investigations, and thousands of pages of discovery. Protective orders that limit what information can be left with the client in a

correctional institution are a regular part of federal practice and present a particularly unique challenge when in person meetings are prohibited.

7.      Many federal inmates are approached by the government with the opportunity to cooperate, or provide information, in order to receive a break on their sentencing recommendation, or to eliminate the mandatory minimum in their case. Under the present visitation scheme, Attorneys cannot safely meet with their clients to discuss the pros and cons of cooperating, a decision which could have an enormous impact on the outcome of the case, and the safety of the client.

8.      I covered the Southeast Alaska Calendar for the federal defenders for a period of five years. In any given year, I would travel to Juneau almost weekly to meet with clients at Lemon Creek Correctional Center. If other work obligations kept me from traveling to meet with my clients in person, I would experience an increase in complaints and frustration at the pace of negotiations. There is simply no substitute for in person meetings to cultivate trust and assist the client in making one of the most important decisions of their lives.

9.      The federal defense bar stands ready to comply with any safety protocols established by the Department of Corrections to ensure safe in person visits, including meeting through a glass partition, masks, social distancing, and temperature checks.

//

//

//

DATED at Anchorage, Alaska this 2nd day of March, 2021.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Jamie McGrady*
Jamie McGrady
Federal Defender

Declarations have the same legal force as affidavits. 28 U.S.C. § 1746.

Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Counsel for Defendant Matthew Wilson Moi

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   vs.<br><br>MATTHEW WILSON MOI,<br><br>          Defendant. | Case No. 3:19-cr-00112-TMB-DMS-2<br><br>**DECLARATION OF<br>BURKE WONNELL,<br>ASSISTANT FEDERAL DEFENDER**<br><br>**(Filed Pursuant to 28 U.S.C. § 1746)** |

I, Burke Wonnell, declare under penalty of perjury that the following is true and accurate to the best of my belief and knowledge:

1.      I am an attorney licensed to practice in Alaska.  I have practiced criminal law in state and federal courts in Alaska continuously since 1996.  My practice has focused on criminal defense since 1998.  I am presently employed as an Assistant Federal Defender for the Federal Public Defender's office in Anchorage.

2.      Since 1998, I have represented hundreds of defendants in criminal cases.  The majority of those individuals were detained by the Alaska Department of Corrections (hereinafter "DOC") for at least a portion of the pendency of those representations.  I am actively representing several people with federal charges who are currently detained in DOC facilities.

3.     Based upon my professional experience, it is my opinion that adequate assistance of counsel requires attorneys to meet personally with their clients in private settings in order for the client to provide sufficient information for the attorney to prepare the defense in the overwhelming majority of cases.  Phone calls, video conferences, and similar remote alternatives to personal visits are inadequate for this purpose.  Distrust of the lack of confidentiality in the remote communication, by either the attorney or the client, prohibits the exchange of information necessary for the adequate preparation of a defense.  Distrust of the attorney by the client similarly prohibits the sharing of information necessary for the adequate preparation of a defense.  Furthermore, distrust of the attorney makes the client more susceptible to manipulation by other inmates, which in turn increases the risk of bad decisions being made by the client.

4.     I have reviewed a large amount of discovery provided by the prosecuting authority in criminal cases over the years.  Those materials sometimes contain recordings of jail calls.  Multiple times I have heard privileged attorney-client communications, between other attorneys and detainees, contained within these jail calls.

5.     I have been made aware within the last year of two federal criminal cases in which the subject of recorded attorney client communications has been litigated:  *U.S. v. Christopher Miller*, 3:17-cr-TMB DMS, and *U.S. v. Edwin Stoltenberg*, 3:18-cr-109 TMB MMS.  I have reviewed filings pertaining to this issue from both cases.

6.     Based upon my personal experience over the years, my review of pertinent pleadings, and my conversations with prosecutors and other defense attorneys, I have no

confidence in the confidentiality of any remote communication between attorneys and clients in DOC custody. This lack of confidence is not dependent on the intent of any particular government agent. It is irrelevant in my opinion whether the wrongful interception or monitoring of these communications is due to malicious intent or gross incompetence. Based upon my lack of confidence in the confidentiality of these remote communications, I regularly advise clients not to communicate information to me over the phone which they do not wish to be known to the prosecutor. My clients frequently relate their own independent concerns about the confidentiality of these remote communications.

7.      In my experience, many individuals charged in the criminal justice system are inherently distrustful of their appointed attorney. It is not rare for my clients, early in our relationship, to express their belief that I am working for the government's interests and not theirs. The only way to combat this inherent distrust is to build a personal relationship with the client. Building a personal relationship under these circumstances requires face to face interaction.

8.      At some point in March 2020, DOC locked out attorneys and issued a blanket prohibition on attorney client visitation within DOC facilities, purportedly due to the COVID-19 pandemic. I have not been able to meet with any clients in DOC custody since then.

9.      My inability to meet personally with clients, due to DOC policy, has directly and negatively impacted my ability to build necessary personal relationships with my clients. I have seen an increase in the number of clients who have expressed their distrust

for me since the lockout was imposed. I have seen an increase in the number of my clients

taking the advice of "jailhouse lawyers" instead of mine since the lockout was imposed.

Several of these individuals, based upon my experience, would be making better choices if

DOC were to permit attorney-client visits. Those individuals are not receiving effective

assistance of counsel while I am unable to meet with them. Unfortunately, some of these

individuals will end up forcing the Court to conduct jury trials which are not in their best

interests, and which will necessarily result in them doing more jail time.

10.    I believe I could provide constitutionally adequate assistance of counsel, in

most cases, if I were permitted to meet privately with my clients within DOC facilities

through glass or some other transparent medium. I personally am willing to comply with

any reasonable requirements DOC would impose on these visits, to include prior

scheduling, temperature checks, mandatory mask wearing, frequent hand sanitation, and

efforts at contact tracing.

DATED at Anchorage, Alaska this 8th day of March, 2021.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Burke Wonnell*
Burke Wonnell
Assistant Federal Defender

Declarations have the same legal force as affidavits. 28 U.S.C. § 1746.

Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Counsel for Defendant Matthew Wilson Moi

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>MATTHEW WILSON MOI,<br><br>　　　　　　　　Defendant. | Case No. 3:19-cr-00112-TMB-DMS-2<br><br>**DECLARATION OF<br>JANE M. IMHOLTE,<br>ASSISTANT FEDERAL DEFENDER**<br><br>**(Filed Pursuant to 28 U.S.C. § 1746)** |

I, Jane M. Imholte, declare under penalty of perjury that the following is true and accurate to the best of my belief and knowledge:

1.　　I am an attorney licensed to practice in Alaska and Minnesota. I have practiced criminal law in state and federal courts in Alaska continuously since 2015. My practice here and in Minnesota has focused on criminal defense since 2004. I am presently employed as an Assistant Federal Defender for the Federal Public Defender's office in Anchorage.

2.　　Since 2015, I have represented hundreds of defendants in criminal cases in Alaska. The majority of those individuals were detained by the Alaska Department of Corrections (hereinafter "DOC") for at least a portion of the pendency of those

representations. I am actively representing several people with federal charges who are currently detained in DOC facilities.

3. Based upon my professional experience, it is my opinion that adequate assistance of counsel requires attorneys to meet personally with their clients in private settings in order for the client to provide sufficient information for the attorney to prepare the defense in the overwhelming majority of cases. Phone calls, video conferences, and similar remote alternatives to personal visits are inadequate for this purpose. Distrust of the lack of confidentiality in the remote communication, by either the attorney or the client, prohibits the exchange of information necessary for the adequate preparation of a defense. Distrust of the attorney by the client similarly prohibits the sharing of information necessary for the adequate preparation of a defense. Furthermore, distrust of the attorney makes the client more susceptible to manipulation by other inmates, which in turn increases the risk of bad decisions being made by the client.

4. I have reviewed a large amount of discovery provided by the prosecuting authority in criminal cases over the years. Those materials sometimes contain recordings of jail calls. I have not personally heard privileged attorney-client communications between other attorneys and detainees contained within these jail calls, but I am well aware that these violations of attorney-client privilege exist in Alaska.

5. I have been made aware within the last year of two federal criminal cases in which the subject of recorded attorney client communications has been litigated: <u>U.S. v.</u>

Christopher Miller, 3:17-cr-TMB DMS, and U.S. v. Edwin Stoltenberg, 3:18-cr-109 TMB

MMS.  I have reviewed filings pertaining to this issue from both cases.

6.      Based upon my personal experience over the years, my review of pertinent

pleadings, and my conversations with prosecutors and other defense attorneys, I have no

confidence in the confidentiality of any remote communication between attorneys and

clients in DOC custody.  This lack of confidence is not dependent on the intent of any

particular government agent.  It is irrelevant in my opinion whether the wrongful

interception or monitoring of these communications is due to malicious intent or gross

incompetence.  Based upon my lack of confidence in the confidentiality of these remote

communications, I regularly advise clients not to communicate information to me over the

phone which they do not wish to be known to the prosecutor; however, this has proved to

be nearly impossible over the last year.  My clients frequently relate their own independent

concerns about the confidentiality of these remote communications.

7.      In my experience, many individuals charged in the criminal justice system

are inherently distrustful of their appointed attorney.  It is not rare for my clients, early in

our relationship, to express their belief that I am working for the government's interests and

not theirs.  The only way to combat this inherent distrust is to build a personal relationship

with the client.  Building a personal relationship under these circumstances requires face

to face interaction.

8.      At some point in March 2020, DOC locked out attorneys and issued a blanket

prohibition on attorney client visitation within DOC facilities, purportedly due to the

COVID-19 pandemic.  I have not been able to meet with any clients in DOC custody since then.

9.      My inability to meet personally with clients, due to DOC policy, has directly and negatively impacted my ability to build necessary personal relationships with my clients.

10.     For instance, I have a client who may benefit from a cooperation agreement. Time is of the essence.  I have only been recently appointed, have developed no relationship with them and have no confidence our communication will be privileged.  They may miss out on the benefits of cooperation as a result of my inability to visit and meet with them confidentially.

11.     For instance, I have another client with an intellectual disability.  I have recently been asked to advise them as they are looking at a mandatory 99-year sentence on a state case.  A transfer of jurisdiction may keep them from spending the rest of their life in prison if they are convicted or plead guilty.  I cannot have this complicated conversation over the phone or via video with a client I have never met.  I cannot be assured of their comprehension.

12.     For instance, I have a new client also located remotely.  They have never met me and the facility where they are incarcerated does not have videoconferencing.  The government has made an offer to resolve their case.  The client wishes to review discovery and discuss all options; they also have other pending matters and are deeply distrustful of court-appointed attorneys.  Because I cannot visit and thoroughly explain the charges and

the plea offer, I fear they will make decisions they would otherwise not make and that are not in their best interests.

13.      I believe I could provide constitutionally adequate assistance of counsel, in most cases, if I were permitted to meet privately with my clients within DOC facilities through glass or some other transparent medium.  I personally am willing to comply with any reasonable requirements DOC would impose on these visits, to include prior scheduling, temperature checks, mandatory mask wearing, frequent hand sanitation, and efforts at contact tracing.

DATED at Anchorage, Alaska this 8th day of March, 2021.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

/s/ Jane M. Imholte
Jane M. Imholte
Assistant Federal Defender

Declarations have the same legal force as affidavits. 28 U.S.C. § 1746.

Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Counsel for Defendant Matthew Wilson Moi

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>   vs.<br><br>MATTHEW WILSON MOI,<br><br>                   Defendant. | Case No.  3:19-cr-00112-TMB-DMS-2<br><br>**DECLARATION OF<br>BEN W. MUSE,<br>ASSISTANT FEDERAL DEFENDER**<br><br>**(Filed Pursuant to 28 U.S.C. § 1746)** |

I, Ben W. Muse, declare under penalty of perjury that the following is true and accurate to the best of my belief and knowledge:

1.      I am an attorney licensed to practice in Alaska.  I have practiced criminal law exclusively for the past 8 ½ years and have been licensed approximately 10 years.  Prior to February 1, 2021, I served as the Deputy Director of the Alaska Public Defender Agency ("Agency"). In that capacity, I managed statewide operations in the Agency's 13 offices and served as the Agency's liaison with the Alaska Department of Corrections ("DOC"). As Deputy Director, I also carried a caseload of serious felony matters, and many of my clients were in DOC custody. On February 1, I began work as an Assistant Federal Defender for the Federal Public Defender in the District of Alaska.

2.      Since 2012, I have represented hundreds of clients in criminal cases.  Many of those individuals were detained in the DOC for—at least—a portion of their cases.  I am actively representing several clients facing federal charges who are currently detained in DOC facilities.

3.      Based upon my professional experience, both in representing clients in DOC custody and in supervising other attorneys doing the same, it is my opinion that, in the majority of instances, attorneys cannot effectively represent their in-custody clients unless they are permitted to meet in-person with these clients within the DOC.

4.      In my experience, prior to the COVID-19 pandemic, nearly every new appointment began with an in-person attorney visit, rather than a phone call, at a correctional institution. This was by design as it allowed for clear, direct communication at the outset of a representation and allowed attorneys to build rapport and trust with their clients.

5.      I found in-person contact with incarcerated clients to be so essential that, prior to the COVID-19 pandemic, as Deputy Director, I would often approve travel requests to have attorneys stationed in rural communities travel great distances to meet with clients who had been transferred out of rural institutions into larger institutions located in and around hub-communities, *e.g*., Goose Creek Correctional Center and Lemon Creek Correctional Center. I strongly believed then, as I do now, that this in-person visitation, though often costly, was an expense necessary to effective representation.

6.      Often, clients of indigent defense organizations possess beliefs or suffer from limitations that, in many instances, make in-person visitation critical. For instance, during my career, many clients I have represented have been paranoid about communicating over the prison phone system for fear they might be monitored or have been distrustful of court-appointed counsel in general, potentially due to a past negative experience. These clients frequently respond quite well to having an attorney visit them in-person. Many other clients suffer from a mental illness or cognitive disorder, impacting their ability to communicate or retain and understand information, often in subtle ways which can be better detected in-person.

7.      As Deputy Director, I was uniquely positioned to observe the negative effects of the DOC's policy decision at the outset of the COVID-19 pandemic to indefinitely discontinue in-person visitation.  I was charged with receiving and investigating client complaints about Agency attorneys. I observed a significant increase in client complaints related to poor communication with attorneys after the DOC's policy went into effect and believe this was caused, in part, by the lack of in-person interaction between clients and their attorneys.

8.      In my experience, strained attorney-client relations often adversely affect the client. Frequently clients will reject the sound legal advice of counsel they do not trust or have a rapport with, and a lack of effective communication often causes the delay in disposition of a case and can prolong the amount of time a defendant stays in custody.

9.      I also believe, having participated in more than 20 jury trials, that the DOC's policy to discontinue in-person visitation has made it impossible, in many instances, to effectively prepare an in-custody client for a jury trial. I do not believe that the court system can fairly resume jury trials for all in-custody clients until the DOC permits in-custody visitation.

10.      In my experience, in-person visitation is an essential component to the effective representation of a client in a jury trial. I have found it vital—both to the preparation of a defense and to my relationship with my in-custody clients—to be able to visit my clients liberally, and in-person, in the days leading up to trial and during trial, after trial proceedings have ceased for the day.

11.      Frequently, in preparation for trial, I would review discovery and testimony with a client and assist them in preparing for cross-examination, often by subjecting them to a mock-cross examination by another attorney. This ensures that clients are adequately informed, it prepares clients for the stresses of the adversarial setting, it gives them insight into the process of offering testimony, and, in turn, allows clients to make an informed decision about whether to testify or exercise other rights. It is my opinion that such preparation, which often turns on the dynamics of in-person, inter-personal communication, cannot be done effectively via remote technology.

12.      Doubtlessly, a criminal jury trial would be one of the most stressful events in any individual's life. In that context, in-person visitation, immediately prior to and during trial, takes on greater importance. In-person visitation enhances both

communication with a client and displays to clients that they are a priority and that their attorney is invested in their case.

13. In March 2020, upon ceasing in-person visitation, the DOC allowed attorneys to schedule a weekday call with a client in most institutions with 24-hours advance notice. By November 2020, most institutions allowed attorneys to videoconference with clients via Microsoft Teams. While the ability to schedule telephonic and videoconference meetings with clients has been undoubtedly useful, it has been inadequate to fully address the needs of most attorneys because there is a marked qualitative difference between remote communication and in-person visitation. Further, telephonic and video-conferencing options are not available to the same extent in-person visitation was available prior to COVID-19. For instance, in my experience, it would be very difficult to arrange a telephonic visit at 5 p.m. on a weekday on short notice. Previously, if attorneys realized late in the day that they needed to speak with a client, they would be able to go to the jail and visit their clients. Further, it does not appear, in my experience, that telephonic or video visitation is available on the weekends in every institution. My experience was that many Agency attorneys were frequently so busy during the workweek, they often visited clients on the weekend, so the unavailability of remote visitation on the weekend stands as a significant limitation on the ability of counsel to communicate with clients.

14. Recognizing the impact the DOC's policy decision to cease in-person visitation would have on the Agency's ability to effectively represent its clients, I

continuously lobbied the DOC orally and via email from March 2020 until February 2021 for it to modify its policy and allow in-person visitation to continue in some form. I was told in several instances by DOC officials that the DOC would not allow for in-person visitation during the COVID-19 pandemic unless a court ordered it.

15.     During the COVID-19 pandemic, I successfully worked with administrators at the Department of Juvenile Justice ("DJJ") to fashion a workable plan to allow Agency attorneys to visit their clients being held in congregate settings operated by the DJJ, such as McLaughlin Youth Center.

16.     On December 30, 2020, I sent my last request to resume in-person visitation, on behalf of the Agency, to DOC Deputy Commissioner Kelly Goode and Director of Institutions Jeremy Hough. I highlighted the fact that the DJJ allowed in-person visitation in its congregate settings. I also emphasized my belief that the lack of in-person visitation was causing trial court proceedings to be delayed which, in turn, was contributing to a backlog within the criminal justice system and causing over-crowding within the DOC.

17.     Director Hough, on December 30, in response to my email, indicated that the DOC was not yet prepared to resume in-person visitation.

DATED at Anchorage, Alaska this 2nd day of March, 2021.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Ben W. Muse*
Ben W. Muse
Assistant Federal Defender

Declarations have the same legal force as affidavits. 28 U.S.C. § 1746.