# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br><br>    vs.<br><br><br>MATTHEW MOI, et al.,<br><br>      Defendants. | No. 3:19-cr-00112-TMB-DMS<br><br>**REPORT AND RECOMMENDATION[1] TO GRANT IN PART AND DENY IN PART DEFENSE MOTION TO COMPEL REASONABLE ACCESS TO COUNSEL AND DIGITAL DISCOVERY [Dkt. 266]** |

## I.  INTRODUCTION

Defendant Matthew Moi filed a motion to compel reasonable access to counsel and digital evidence (Dkt. 266). The motion was joined by co-defendants Myrick Elliot, Kenneth Ford, Jordan Shanholtzer, and Marvin Nelson. Defendants' original motion sought (1) a Court visit to DOC facilities to view possible attorney-client visitation areas, (2) "[a]n order directing DOC to immediately develop a timeline for implementation of policies and procedures that will provide in-person attorney access to incarcerated defendants," and (3) other relief as the Court finds necessary (Dkt. 266 at 6-7). The defendants assert that DOC restrictions on in-person attorney-client visitation violated the defendants' constitutional rights.

---

[1] This report and recommendation is being issued as a final report and recommendation. Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Court Judge who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel        1

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 1 of 31

Matthias Cicotte entered appearance on behalf of the Alaska Department of Corrections (DOC) (Dkt. 285).

An evidentiary hearing on the motion was conducted on March 15, 2021 (Dkt. 282) and continued on March 31, 2021 (Dkt. 291). At the conclusion of the hearing, the Court requested the following additional information: (1) diagrams and photos of DOC facilities so the Court can determine whether an on-site visit is warranted, (2) updated requested relief from the defense, (3) further briefing from the DOC or the government on the legal issues, and (4) any response from the defense (Dkt. 291 at 68).

The DOC provided photos and diagrams to the Court on April 12, 2021 (Case 3:20-cr-00021-TMB-DMS, Dkt. 201-1 *SEALED*).

Defendant Moi provided updated requested relief to the Court on April 9, 2021 (Dkt. 294). The defense requests that the Court (1) schedule a Court visit of "the various discovery and inmate computer access locations" at DOC facilities, (2) order DOC to develop a new discovery review policy, (3) order DOC "to abide by the orders issued by the court in Alaska State case 3AN-21-04325CI," and (4) other relief as the Court finds necessary (Dkt. 294 at 2).

The DOC submitted further briefing to the Court on April 28, 2021 (Dkt. 297). The DOC asserts the issue is now moot due to a state preliminary injunction issued in Alaska state case 3AN-21-04325CI and argues that the defendants' requested relief regarding discovery is outside the scope of the original motion and "should properly be considered an entirely new motion which . . . [has not] been squarely presented to the court" (Dkt. 297 at 3). The Court disagrees that the issue is moot since the Court could still grant effectual relief to the defendants.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel
2

The motion is now ripe for consideration by the Court. For the following reasons, the Court recommends that the motion be granted in part and denied in part, and that the DOC be directed to provide in-person attorney consultations for both vaccinated and unvaccinated defendants, as discussed below.

## II.   STATEMENT OF FACTS

At the time of the March 15, 2021 evidentiary hearing, defendants Moi, Elliot, and Ford were housed at Goose Creek Correctional Facility and defendants Shanholtzer and Nelson were housed at Anchorage Correctional Facility (Dkt. 282 at 5). These facilities are both administered by the State of Alaska Department of Corrections (DOC).[2]

### A. DOC Suspends All In-Person Visitation at DOC Facilities in Response to the COVID-19 Pandemic.

In response to the COVID-19 pandemic, the DOC suspended all in-person visitation with inmates at DOC facilities on March 13, 2020 (Dkt. 266 at 1). Since then, the DOC has implemented alternative means of providing inmates with private attorney/client communication and discovery review, including (1) acquiring Microsoft Teams video-conferencing computers, (2) establishing private attorney call rooms, and (3) acquiring non-networked discovery review computers and developing a process to provide for review of protected discovery.

As of March 15, 2021, the DOC had purchased 40 additional computers to be used as Microsoft Teams computers, 37 of which were operational at that time (Dkt. 282 at 247). The computers are "networked computer[s] that allow[] for real time video" between the inmate and their counsel (Dkt. 282 at 242). Microsoft Teams is a more secure alternative to other video-

---

[2] There are no federal prisons in Alaska, the United States therefore contracts with the State of Alaska to house federal inmates in DOC facilities.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                    3

conferencing systems since it does not allow the recording of meetings without notifying all participants on the call (Dkt. 282 at 243). Microsoft Teams also allows the attorney to "screen share" to jointly review discovery with their client (Dkt 282 at 244).

As of March 15, the DOC had purchased an additional 14 phone lines (Dkt. 282 at 248). Those lines were placed in private rooms for private attorney/client phone calls (Dkt. 282 at 242).

As of March 15, the DOC has purchased an additional 38 private discovery review computers (Dkt. 282 at 248). The private discovery computers, "are non-networked computers with thumb drive access so that [inmates] could review their discovery" on their own (Dkt 282 at 242). Before the pandemic, it was common for defendants to review the discovery in their case during in-person visits with counsel (Dkt. 282 at 83). The DOC also implemented a system by which protected discovery can be submitted to the DOC and provided to inmates to review in private (Dkt. 282 at 92-93).

For over a year, all in-person visitation was suspended at DOC facilities. Evidence submitted to the Court demonstrated that as of March 15, 2021, correctional facilities in 38 other states allowed some sort of in-person visitation (Dkt. 282 at 92).[3] Dr. Lawrence, the DOC's Chief Medical Officer and member of the DOC's COVID decision-making team, never consulted with those other states about how they were able to safely resume in-person counsel visitation (Dkt. 282 at 199). When asked if he had been in contact with other states that were now allowing in-person counsel visitation, Dr. Lawrence stated, "I don't know which ones do

---

[3] Currently, corrections facilities in 46 states (including Alaska) permit in-person attorney visitation. Def. Ex. D-3, research from The Marshall Project, updated on May 7, 2021. Retrieved from <https://www.themarshallproject.org/2020/03/17/tracking-prisons-response-to-coronavirus>.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 4

and which ones do not allow consultation. I have consulted with, you know, colleagues in other states, and certainly on nation calls have talked to colleagues, but not about this particular issue of . . . consultation with attorneys coming into the facility" (Dkt. 282 at 199).

During the March 15, 2021 evidentiary hearing, the Court took judicial notice that while there were 1,360 inmates testing positive for COVID-19 in DOC facilities statewide in December, 2020, that number went down to 312 in January, 2021; 13 in February, 2021; and only four on March 8, 2021 (Dkt. 282 at 215-16). There were only 54 positive COVID-19 cases in all DOC facilities as of March 15, 2021 (Dkt. 282 at 215-16). This information was provided to the Court by U.S. Marshal Rob Heun, based upon DOC statistics.

**B. Impediments to Defendants' Access to Counsel and Discovery**

**1. Video and phone shortcomings in communicating with incarcerated defendants**

Dr. Becker, a clinical psychologist who routinely conducts evaluations of incarcerated individuals, testified about the benefits of in-person communication versus video or phone calls (Dkt. 282 at 14-15, 20). Dr. Becker asserted that video or phone communication is "a lower bandwidth form of communication" than in-person conversations (Dkt. 282 at 21). She explained that:

> [F]rom a communication standpoint, interacting with someone in person, in a quiet space, free from distraction or disruption, is ideal . . . for a variety of reasons. One of those reasons is the ability to just generally access body language more effectively. You can see how the defendant . . . is responding, how they're sitting, how their eye contact is, how engaged they are. You're closer. You can better interpret facial expression, things like that . . . [a]nd they get that same benefit from whomever it is that they're in the room with. . . .

(Dkt. 282 at 20).

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                    5

Even if the in-person visitation occurs through plexiglass or some other transparent barrier, she asserted that there are a lot of benefits of in-person visitation over video or phone calls, because "you're going to have access to . . . the full body language of the defendant and they're going to have access to yours, which is going to provide greater richness to your communication" (Dkt. 282 at 51-51). She testified that on the phone or video, "[i]t's harder to do the back and forth" between the client and counsel, "if an individual was overtalking or difficult to redirect, it's much harder to sort of rein them in . . . you essentially clip in and out, interrupting one another" making it difficult to manage the conversation effectively (Dkt. 282 at 21).

Video communication is also prone to disruption, as evidenced by the two times that the Court lost video connection with the defendants who were participating in the hearing from DOC facilities via Polycom (Dkt. 282 at 7, 31). Dr. Becker testified that the outages experienced during the hearing were "exemplary of some of the fairly common types of disruptions that occur" during her video-conference evaluations with incarcerated individuals (Dkt. 282 at 33). She explained, "it's disruptive and then you have to sort of restart whatever it is that you've been doing or talking about" (Dkt. 282 at 33).

Dr. Becker also stated that incarcerated defendants are "under more stress and do have a harder time communicating, and then when you have these frequent disruptions, it simply is additive and it makes it more difficult to communicate" (Dkt. 282 at 33). Of Dr. Becker's 40-50 video evaluations she has conducted since the beginning of the COVID-

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 6

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 6 of 31

19 pandemic in 2020, she estimates she's had 15 to 20 disrupted calls that required

rescheduling and five to seven that were canceled (Dkt. 282 at 47-48).

## 2. Alaska Bar Association ethics rules are implicated when a criminal defendant's court-appointed counsel cannot visit their client in-person.

Philip Shanahan, Bar Counsel for the Alaska Bar Association and a former criminal

defense lawyer, testified regarding the ethical implications of a lengthy in-person visitation

suspension. Shanahan testified that he believes "in-person visitation, especially in the court-

appointed context, is crucial to being an effective lawyer" (Dkt. 282 at 63); and that the "best

ethical practice for a lawyer is to meet with their client in person at any opportunity they can in a

criminal defense court-appointed context" (Dkt. 282 at 74). He explained, "When you're a court-

appointed lawyer, . . . you often start out in a position of distrust. The client doesn't trust you.

They don't know who you are. They didn't pick you . . . they look at you as somebody who,

perhaps, works for the system . . . [who] gets paid by the same person the prosecutor does" (Dkt.

282 at 63-64).

Shanahan testified that "the rules of professional conduct are clearly implicated by a lack

of access to a client" (Dkt. 282 at 66). First, under Rule 1.4, "[a] lawyer has a duty to

communicate with their clients. . . . A lawyer has to comply promptly with requests for

information from a client, and a lawyer has to explain information to a client so that the client

can make reasoned and informed decisions about how to proceed with their cases" (Dkt. 282 at

67). Shanahan testified that "communication is probably our biggest complaint that we get . . . at

the Bar Association, lawyers who aren't spending enough time communicating with their clients,

not responding to their client's calls or not visiting when they say they're going to visit" (Dkt.

282 at 67).

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 7

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 7 of 31

Under Rule 1.3, an "attorney has a duty to be diligent and zealous and even if it's difficult for a lawyer, if it makes your life more complicated" (Dkt. 282 at 67). Rule 1.1 provides that "an attorney needs to be thorough and prepare while representing a client" (Dkt. 282 at 66). Shanahan explained, "[t]hat means if you have a choice -- for example, speaking pre-pandemic, if a lawyer told me, 'oh I never go to the jail, it's easier to just talk to them on the phone,' they're not being diligent, they're not being competent" (Dkt. 282 at 67). Shanahan testified that "the American Bar Association just issued an ethics opinion . . . specifically addressing remote work and noting that the ethics rules don't disappear because of the pandemic. Lawyers still have a duty to comply with the ethics rules to the extent feasible and the extent possible" (Dkt. 282 at 68).

Shanahan testified that he believes certain trial preparations need to be in-person to be effective; for example, preparing a client to testify at trial (Dkt. 282 at 71).

> It requires a lot of time. It requires a lot of in-person back and forth. It requires usually, in my mind, proper preparation would require a mock cross exam by another lawyer. It would require you to -- to spend the time watching the client, observing how the client behaves when being asked questions so that you can see those nonverbal things that might require some work. You know, hey, you tap your leg all the time, that's going to get really distracting in court. Or, you know, you keep scratching your knee the whole time you're trying to answer questions. That's just going to drive everybody in the courtroom crazy, things like that that you'd watch and observe, and I think to be competent and diligent, you certainly -- I would have problems if a client filed a complaint in my office and said, "My lawyer put me on the stand and never met with me in person to prepare my testimony." I would think there would be some competence and diligence issues there.

(Dkt. 282 at 71-72).

Shanahan conceded that, although never visiting with your criminal defendant client in-person would likely arise to an ethics violation in pre-pandemic times, there is no violation when

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 8

in-person visitation cannot occur despite an attorney's best efforts (Dkt. 282 at 71). Shanahan explained, "right now . . . there are lots of potential ethics violations that are happening, but lawyers can't fix it on their own, . . . we aren't seeking to discipline lawyers for those things," however, Shanahan asserted that the suspension of in-person visitation needs to be remedied "as quickly as possible" (Dkt. 282 at 72).

### 3. The Defendants' discovery review difficulties

Before the pandemic, much of an incarcerated criminal defendant's discovery review took place during in-person visits with counsel (Dkt. 282 at 83). Shanahan testified that during his time as a criminal defense attorney,

> I would often bring the discovery down, and sitting next to a client, showing them, pointing out things or highlighting things. I had clients [where] literacy was an issue, so the way I would figure that out is I might . . . have something in front of them and they would start to read it and I would realize that they're really not reading it, they're not understanding when I ask them, so what do you think about that. . . . I would always review discovery in person because that was the way to do it, if I could, and I would sit with the client and go through, and if it was photographs, I mean, trying to -- you know, wait, here it is, it's over here, pull this folder out and bring it out in front of a client was definitely something I did frequently.

(Dkt. 282 at 83-84). This is particularly true when a case involves voluminous discovery (Dkt. 282 at 85). He testified that sort of discovery review is necessary for a defendant's effective assistance of counsel (Dkt. 282 at 85).

Shanahan testified that this extends to plea agreements as well, stating that:

> I would always want to sit with the client and . . . in a federal case, for example, I would want to go through the written plea agreement in person with the client, and in state court, if there was a written offer, I would want to sit and go through that offer with the client in person. Not saying I never did it over the phone. If a client knew an offer was coming and a client called and said did we get an offer, did they say yes, I would sometimes tell a client that over the phone, but generally, I would go through it in person.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                              9

(Dkt. 282 at 84).

After in-person visitation was suspended, incarcerated defendants' only means of electronic discovery review was (1) via the "screen share" function during a Microsoft Teams video-conference with counsel or (2) in private at a non-networked discovery review computer after counsel submitted a flash drive containing the discovery to the DOC.

### a. Problems reviewing discovery on Microsoft Teams computers

Bruce Johnson, Chief Investigator at the Office of the Federal Public Defender, testified that he and his clients have had issues reviewing discovery via the Microsoft Teams computers (Dkt. 282 at 114-115). The defendants are unable to zoom in to better see the discovery being displayed, because they cannot manipulate the screen (Dkt. 282 at 115). Johnson explained that "in the Moi case, if I wanted to talk with my client about a bunch of cell data, which is very small font . . . it would be extremely difficult for our client to see that information because . . . they can't touch the monitor, and so they can't zoom it" (Dkt. 282 at 115). Discovery in Moi's case involves photographs, audio, video, Excel spreadsheets, and "about 80,000 pages of documents" (Dkt. 282 at 147-48). Johnson testified that the limit on access to discovery has proven problematic to Moi (Dkt. 282 at 148).

Regarding the maps at issue in Moi's case, Johnson testified that:

[I]n order to really make that effective, I'd have to be in person, because I'd have to show him the data, the underlying data, and the map. I need to show the relationship of the documents as opposed to, here's a document, and then if I showed him just a map and he said, well, where did you get that from, then I got to take that down and then bring this up, and so it's very inefficient . . . And so a lot of times, it's not a matter of just showing one document. Many times when I'm in the jail, I have multiple documents out, because they're related in some sort of way or another.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 10

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 10 of 31

(Dkt. 282 at 149, 151).

Another concern with Microsoft Teams meetings is that Johnson realized that Microsoft Teams autosaves chat logs to an organizer's hard drive (Dkt. 282 at 114). He became aware of this issue when he found downloaded chat logs from Microsoft Teams meetings he had organized (Dkt. 282 at 114). DOC is the "organizer" on all Microsoft Teams meetings that occur between inmates and their counsel at DOC facilities; while the inmate cannot use the chat function, since they do not have access to a keyboard, the defense team used it to communicate amongst each other during meetings (Dkt. 282 at 114). Johnson testified that he has made sure that the defense teams he works with have stopped using the chat function on Microsoft Teams calls to DOC facilities (Dkt. 282 at 114).

### b. Defendant Ford's private discovery review problems

From the record before the Court, Ford had issues receiving and reviewing discovery on a DOC private discovery review computer (Dkt. 282 at 127-130). Counsel for Ford, John Murtagh, explained that after sending a thumb drive to Ford at Goose Creek Correctional Facility pursuant to new DOC protocols, it was sent back to Murtagh with no explanation (Dkt. 282 at 127). Johnson testified that the problem was that DOC staff at Goose Creek were not made aware of the new policy (Dkt. 282 at 127).

After resending the discovery and the DOC receiving it, Ford scheduled a time to review the discovery, however, "Ford was placed in a room with a computer and his thumb drive, but was told he couldn't bring in pencil and paper to take any notes" (Dkt. 282 at 127). Johnson testified that the issue was that the Correctional Officer at Goose Creek had not read the orders included with the discovery carefully enough (Dkt. 282 at 128).

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                11

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 11 of 31

Next, Ford was provided a pencil, paper, and the thumb drive with this discovery on it, but he was unable to open it because it was McAfee protected (Dkt. 282 at 128). Johnson testified that the discovery had been received from the government, who had protected it via McAfee software; McAfee protected discovery cannot be opened on DOC's non-networked discovery computers (Dkt. 282 at 128-29). Johnson testified that DOC has been made aware of the problem, but Johnson did not know if it had been resolved (Dkt. 282 at 129). By March 31, DOC Director of Institutions Jeremey Hough testified that he believes the DOC "IT department is working on" fixing the McAfee problem (Dkt. 291 at 34).

During the March 31, 2021 evidentiary hearing the problem was seemingly fixed when the parties agreed that the defense could recopy the discovery onto another thumb drive (without McAfee protection) before sending it to DOC, which could then be opened on a DOC computer (Dkt. 291 at 36-37). The Court received no further briefing about this problem.

### C. DOC Announces New Policy to Resume In-Person Counsel Visitation to Vaccinated Inmates Only

During the evidentiary hearing on March 15, 2021, DOC Director Hough informed the Court that the DOC had finalized an updated visitation policy since the start of the evidentiary hearing (Dkt. 282 at 240). The new policy provided that DOC facilities will "reopen in-person attorney-client visitation for all inmates who have been fully vaccinated" (Dkt. 282 at 240). Hough explained that "[p]eople are considered fully vaccinated if at least two weeks have passed since they've received the second dose of a two-dose series, Moderna or Pfizer, or at least two weeks have passed since receiving a single-does vaccine, Johnson & Johnson" (Dkt. 282 at 241).

Hough testified that for unvaccinated inmates, "[t]hey will still be given their visitation through Teams, until we've progressed to a place where its medically safe to have the visitations.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 12

The goal is always to return to normal operations" (Dkt. 291 at 16). When asked to explain why a vaccinated attorney visiting an unvaccinated inmate "through the glass, masked and otherwise" following social distancing guidelines, poses too great a risk to allow such visitation, Hough did not have an answer but stated that the question was better left to medical professionals (Dkt. 291 at 16). DOC's Chief Medical Officer, Dr. Robert Lawrence testified that "there's no question" that a physical barrier, such as plexiglass, reduced the risk of COVID-19 transmission during an in-person visit with an inmate, but he asserted that the risk would not be reduced to zero (Dkt. 282 at 187).

### D. Preliminary injunction issued in Alaska state case 3AN-21-04325CI

A number of defense attorneys brought a civil suit in Alaska state court against the DOC challenging DOC's in-person visitation suspension. *Curtner et al. v. Dahlstrom et al.*, 3AN-21-04325CI. On April 5, 2021, the court issued the following preliminary injunction:

1. DOC shall not distinguish in its visitation policies between vaccinated and unvaccinated inmates.
2. DOC shall open, and keep open, its visiting facilities to attorneys provided that visiting attorneys follow social distancing, masking, and other safety requirements in accordance with the most recent CDC guidelines and DOC policies.
3. Attorneys wishing to conduct visits with clients shall notify DOC at least 24 hours in advance to allow DOC to accommodate these visits according to the most recent guidelines regarding building maximum capacities.
4. DOC will not deny attorneys access to facilities absent good cause (for example, an attorney or her client testing positive for COVID-19). If such instances occur, these instances must be documented and submitted to the Court, along with sworn affidavits from at least two DOC personnel in supervisory positions.

(Dkt. 290-1 at 15-16).

//

//

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 13

**E. DOC Implements Second Revised Policy in Response to Preliminary Injunction.**

In response to the state court preliminary injunction, the DOC implemented a second revised visitation policy providing inmates with in-person visitation with counsel regardless of vaccination status on April 6, 2021 (Dkt. 293-1 at 1).

**1. In-person visitation with a physical barrier**

DOC asserts that the majority of attorney visitation has occurred through physical barriers, such as plexiglass, since the implementation of its new policy (Dkt. 297 at 6). DOC's "Attorney Visitation Guidelines," provides that "[w]here attorney visitation takes place in two separate rooms with telephone communication," and a physical barrier, "the inmate may return to previous housing including general population housing" without first being quarantined, regardless of their vaccinated status (Dkt. 293-1 at 1).

**2. In-person visitation without a barrier**

The guidelines provide that in-person visitation without a barrier may take place in rooms arranged "to allow at least six feet separation—except where discovery or review of documents requires closer interactions" (Dkt. 293-1). If either the defendant or the attorney is unvaccinated, the inmate is subject to a 14-day quarantine before returning to general population (Dkt. 293-1 at 1).

//

//

//

//

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                    14

**F. DOC Reopens Public Visitation at DOC Facilities**

On April 19, 2021, the DOC voluntarily reopened public (non-attorney) visitation to fully vaccinated inmates in all its facilities.[4] Less than two weeks later, the DOC reopened public visitation to unvaccinated inmates as well; DOC Commissioner Nancy Dahlstrom remarked that "[o]ur first step in opening visitation went smoothly and without incident, allowing the department to open to full visitation sooner than expected."[5] The updated policy provides for public in-person visitation with a physical barrier only. There is no quarantine requirement for inmates after such visitation.

## III.  APPLICABLE LAW

**A. Jurisdiction Over Challenges to Conditions of Confinement by Pretrial Detainees Within a Criminal Case**

Generally, pretrial detainees may only challenge their conditions of confinement in a civil action brought pursuant to (1) *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, (2) 42 U.S.C. § 1983, or (3) 28 U.S.C. § 2241. *See United States v. Yandell*, No. 2:19-CR-00107-KJM, 2020 WL 3858599, at *4 (E.D. Cal. July 8, 2020) (citing *United States v. Luong*, No. CR 99-433 WBS-GGH, 2009 WL 2852111, at *1-2 (E.D. Cal. Sept. 2, 2009)); *Bivens*, 403 U.S. 388, 389 (1971). Courts disfavor attempts to litigate conditions of confinement as motions in a defendant's criminal case. *Luong*, 2009 WL 2852111, at *1–2. Since, "[p]ermitting defendant to file grievances in his criminal proceeding not directly related to his

---

[4] Alaska Dept. of Corrections, Press Release: "DOC Reopens Public Visitation" (April 19, 2021), retrieved from <https://doc.alaska.gov/commish/pressreleases/DOC%20Press%20Release%20-%20DOC%20Reopens%20Public%20Visitation.pdf>.
[5] Alaska Dept. of Corrections, Press Release: "DOC Fully Reopens Public Visitation" (April. 28, 2021), retrieved from < https://doc.alaska.gov/commish/pressreleases/DOC%20Press%20Release%20-%20DOC%20Fully%20Opens%20Visitation.pdf>.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                                    15

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 15 of 31

ability to exercise his rights in that proceeding would circumvent his obligation to exhaust administrative remedies before seeking redress in court." *Id.*

However, one exception to this rule is where a pretrial detainee challenges the conditions of their confinement that infringe upon their ability to consult with counsel or exercise other trial rights. *Yandell*, 2020 WL 3858599, at *4; *United States v. Wade*, No. 3:07-cr-00111-RRB-JDR, 2009 WL 3837151, at *1 (D. Alaska Nov. 13, 2009) (acknowledging "that the Court does have jurisdiction to consider whether the conditions of [a pretrial detainee's] confinement prevent him from aiding his attorneys in his defense and obtaining a fair trial").

## B.  Constitutional Rights of Pretrial Detainees

The Sixth Amendment extends a right to effective assistance of counsel to all criminal defendants. U.S. CONST. amend. VI. This right attaches at the time of the defendant's first appearance before a judicial officer, where the defendant is made aware of the accusations and restrictions of liberty are imposed. *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 194 (2008). The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. This includes access to courts to challenge their convictions and to seek and receive the assistance of counsel. *Procunier v. Martinez*, 416 U.S. 396, 419(1974) (*overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989)).

### 1.  A prison regulation impeding inmates' rights may be upheld under *Turner*.

Prison regulations that impede an inmate's constitutional rights will nevertheless be upheld if the regulation "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The court in *Turner* identified four factors for courts to use when

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 16

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 16 of 31

assessing the reasonableness of a prison regulation: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact . . . the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources," and (4) "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id*. at 89-90 (internal quotation marks omitted).

### a. Factor 1: Rational Connection

A rational connection exists where prison administrators can articulate the "logical connection between the regulation and the asserted goal." *Id*. at 89. To strike down a regulation, the connection must not exist or be "so remote as to render the policy arbitrary or irrational." *Id*. at 89-90. The burden is on prison authorities to "first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests." *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990). General assertions from prison administrators that a policy "clearly has a logical connection to legitimate governmental interests" is not enough. *Id*. at 387.

### b. Factor 2: Alternative Avenues

If there are alternative ways a prisoner can exercise their asserted right, then the prison regulation is less likely to violate the Constitution. *Turner*, 482 U.S. at 90. If alternatives exist, "courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Id*. (internal quotation marks omitted).

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                17

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 17 of 31

Alternatives are interpreted broadly; if a prisoner can still exercise the asserted right in a similar, though not identical way, the prisoner's constitutional rights are preserved. *See Mauro v. Arpaio*, 188 F.3d 1054, 1061 (9th Cir. 1999).

### c.  Factor 3: Cost of Accommodation

"When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correction officials." *Turner*, 482 U.S. at 90 (internal quotation marks omitted). Here, the right of the prisoner is weighed against the rights of other prisoners and prison employees, and where "the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, we should defer to the informed discretion of corrections officials." *Mauro*, 188 F.3d at 1062 (internal quotation marks omitted). Deference to prison administrators is due "[w]hen the allocation of resources and the ability of administrators to protect staff and detainees at the facility are at issue." *Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 976 (9th Cir. 2

### d.  Factor 4: Exaggerated Response

"[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable" and is therefore an exaggerated response to the prison administrator's concerns. *Turner*, 482 U.S. at 90. This does not mean a prison must use the least restrictive alternative, but "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests" a court may find that is evidence of unreasonableness. *Id*. at 90-91. Here, the burden is on the inmate to "point to an alternative that accommodates their rights at *de minimis* cost to security." *Casey v. Lewis*, 4 F.3d 1516, 1523

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                          18

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 18 of 31

(9th Cir. 1993) (citing *Turner*, 482 U.S. at 91). What other prisons are doing may help determine the feasibility of alternatives. *Morrison v. Hall*, 261 F.3d 896, 905 (9th Cir. 2001) (Inmate successfully challenged prison's prohibition of magazine subscriptions after the court found the prison can distinguish between junk mail and magazine subscriptions at *de minimis* cost by looking at another prison's practices).

### 2. *Bell* punitive test for violations of Due Process of pretrial inmates

Restrictions implicating a pretrial detainee's due process rights under the Fifth Amendment are unconstitutional if they amount to punishment of the detainee. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To prove punishment the detainee must show (1) "an expressed intent to punish on the part of detention facility officials" or (2) that the restriction is not reasonably related to a legitimate government objective. *Id*. at 538-39. Punishment under *Bell* "must cause harm or disability that either significantly exceeds or is independent of the inherent discomforts of confinement." *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017) (internal quotation marks omitted). Further, "in the absence of evidence of express intent, [courts] may infer an intent to punish if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Id*. (internal quotation marks omitted).

### C. Mootness and State Court Preliminary Injunctions

"There is . . . no case or controversy, and a suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. But a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal citations omitted). A

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                    19

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 19 of 31

preliminary injunction in a parallel state court action does not meet this impossibility threshold. *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020) ("A *final* state-court judgment . . . *might* make relief in this federal appeal impossible. But neither the federal nor state court has ruled on the merits") (emphasis in original).

## D.   DISCUSSION

### A.  The Preliminary Injunction Issued in Alaska State Court Does Not Moot Defendants' Motion; The Parties in the State Case Agreed to Dismissal Without Prejudice.

The DOC argues that given the preliminary injunction issued in Alaska state case 3AN-21-04325CI, the defendants' request for in-person visitation is moot. A preliminary injunction in a parallel state court does not moot the controversy at issue here; while a final ruling in the state case *might* bear on the mootness of this motion, depending on the relief granted, a preliminary injunction does not. *See N. Carolina State Conf. of the NAACP*, 981 F.3d at 302. Since the DOC's briefings, the parties to the state case entered a stipulation to voluntarily dismiss the action and it was therefore dismissed without prejudice (Dkt. 300-1 at 1). The dismissal without prejudice means that the DOC could return to the visitation policies it had in place prior to the preliminary injunction, which distinguished between vaccinated and unvaccinated inmates. The state court did not reach a ruling on the merits of the case. Therefore, an order from the Court preventing the DOC from reverting to such policy would provide the defendants with effectual relief.

### B.  The DOC's Pre-Injunction Attorney Visitation Policy Violates the Defendants' Sixth Amendment Rights to Counsel and Fifth Amendment Rights to Due Process.

On the day of the evidentiary hearing in this matter, the DOC updated its visitation policy to allow for vaccinated inmates to meet with their counsel in-person. However, as noted, the

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                          20

defendants took issue with the "fully vaccinated" requirement for such in-person visitation. For the following reasons, the Court finds that the DOC's pre-injunction policy, with a distinction between vaccinated and unvaccinated inmates, violated the defendants' Sixth Amendment right to counsel and Fifth Amendment right to due process. To avoid such violation, the DOC must provide unvaccinated inmates with both (1) in-person visitation with a physical barrier and (2) in-person visitation without a barrier, subject to reasonable quarantine requirements.

1. **The DOC's pre-injunction attorney visitation policy fails under the *Turner* test.**

Analysis of the four factors under *Turner v. Safely* demonstrates that DOC's pre-injunction attorney visitation policy, which allows for in-person visitation for vaccinated inmates but not unvaccinated inmates, was not reasonably related to legitimate penological interests. *See Turner*, 482 U.S. at 89. Therefore, the policy amounted to a violation of the unvaccinated defendants' Sixth Amendment right to counsel.

a. **Any rational connection between DOC's pre-injunction policy and the asserted goal of preventing COVID-19 outbreaks in DOC facilities is tenuous given recent developments.**

This Court has previously found that there **was** a rational connection between DOC in-person visitation restrictions and DOC's asserted penological interest: preventing and minimizing COVID-19 outbreaks inside DOC facilities. *United States v. Topps*, No. 3:20-CR-00012-TMB-DMS, 2020 WL 5890433, (D. Alaska Oct. 1, 2020), *report and recommendation adopted*, No. 3:20-CR-00012-TMB (D. Alaska Nov. 5, 2020); *United States v. Soneoulay et al.*, No. 3:20-cr-00021-TMB-DMS, (D. Alaska Dec. 8, 2020), *report and recommendation adopted*, No. 3:20-cr-00021-TMB (D. Alaska Jan. 11, 2021). These findings were made when vaccinations were unavailable, and the findings were premised on the assurances from DOC

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 21

administrators that the restrictions were in constant review and that normal prison operations would begin as soon as it was safe.

As noted *supra*, 1,360 inmates tested positive for COVID-19 in DOC facilities statewide in December, 2020. On March 15, 2021, at the time of the evidentiary hearing, there were only 54 positive COVID-19 cases in all DOC facilities (Dkt. 282 at 215-16). This reduction in cases and increase in inmates who have already contracted the virus and developed antibodies, in conjunction with the vaccination of all inmates who wish to be vaccinated, significantly alters the risks associated with COVID-19 transmission and the reasonableness of restrictions on inmates' constitutionally protected activities.

The DOC's current policies undercut any asserted rational connection between its pre-injunction policy of barring in-person visitation to unvaccinated inmates and minimizing COVID-19 outbreaks at DOC facilities. Under the current, updated DOC policy, if an unvaccinated inmate meets with counsel in-person, but in separate rooms through plexiglass, the inmate can return to the general population without undergoing any quarantine (Dkt. 297 at 6; Dkt. 293-1 at 1). This no-quarantine policy is not a result of the state preliminary injunction, which made no reference to the DOC's quarantine requirements. Instead, the no-quarantine policy was arrived at by DOC's COVID decision-making team (*see* Dkt. 282 at 237); therefore, the DOC itself has found that there is so little risk of COVID transmission to the inmate when a visit takes place in rooms separated by plexiglass that there is no need for the unvaccinated inmate to quarantine.

Initially, the DOC asked the Court to accept its determination that unvaccinated inmates cannot visit with counsel, even through a plexiglass barrier, without posing an undue risk of

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                                                          22

spreading COVID to the prisons' general population. However, when mandated to do so via the state preliminary injunction, the DOC opted not to require unvaccinated inmates to first quarantine before returning to general population. Given these recent developments, even if some connection remains between the DOC's pre-injunction policies and its asserted penological interests, it is tenuous and outweighed after consideration of other *Turner* factors.

Additionally, the DOC currently provides unvaccinated inmates with in-person contact visitation without a barrier, requiring the inmate to undergo a 14-day quarantine afterwards. This quarantine is the same as if the inmate was a new remand to the facility. Such quarantine policy has been in place since DOC's COVID-19 restrictions began and is based on guidance from the CDC that monitoring an inmate for 14 days for signs of COVID-19 or a positive COVID-19 test result mitigates the risk of COVID-19 outbreaks in detention facilities.[6] Given these mitigated risks, any connection between DOC's pre-injunction restriction on in-person visitation without a barrier for unvaccinated inmates and its penological interests is similarly outweighed after consideration of other *Turner* factors.

### b. DOC's alternatives to in-person visitation do not provide the defendants with adequate attorney-client communication and discovery review.

The DOC implemented various alternative means of communicating with counsel and reviewing discovery after in-person visitation was suspended in 2020. While the Court recognizes the efforts by the DOC to limit the impact of COVID-19 restrictions on the defendants' Sixth Amendment rights, those efforts were ultimately inadequate. While a short-

---

[6] Centers for Disease Control and Prevention, "Recommendations for Quarantine Duration in Correctional and Detention Facilities" (Updated Mar. 18, 2021), retrieved from <https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html>.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 23

term restriction on in-person visitation might be remedied through private phone calls and video conferencing, those alternatives cannot replace many of the vital functions of in-person counsel visitation for criminal defendants. Having been suspended for over a year, entire case preparations from the appointment of counsel to entry of a guilty plea have taken place without a defendant ever meeting with counsel in-person. This is extremely problematic for a defendant.

There are numerous benefits to in-person visitation, that cannot be emulated via "lower bandwidth" forms of communication such as video or phone calls (Dkt. 282 at 21). It is difficult to establish trust, read body language, and engage in meaningful discourse about critical aspects of a case over video or phone, particularly when those mediums are subject to frequent disruptions. Some duties of counsel, such as preparing a client to testify at trial, cannot be done effectively without in-person visitation (Dkt. 282 at 71).

Review of electronic discovery is also severely impeded without in-person visitation. When utilizing Microsoft Teams, discovery cannot be readily zoomed in by the defendant; counsel cannot display multiple pieces of discovery or easily move between them, and there are confidentiality concerns regarding the chat logs of those meetings. Further, review of complex, voluminous discovery on DOC private discovery review computers is insufficient if an inmate does not have the chance to also review that discovery with counsel in-person so counsel can make sure the client understands it. Therefore, the alternatives provided by the DOC are not adequate to preserve the defendants' access to counsel and discovery, given the length of time these restrictions have been in place.

Lastly, the Court takes judicial notice of discovery review issues during in-person visitation with a physical barrier at Anchorage Correctional Complex (ACC) reported by defense

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                            24

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 24 of 31

counsel Cynthia Franklin in *United States v. King*, 3:19-cr-00026-TMB-DMS. Franklin reported recently that certain locations in ACC are not private enough for confidential discovery review with counsel accomplished by holding documents up to the plexiglass barrier. At least some of the visitation rooms with a physical barrier are located adjacent to a main entrance and therefore people are frequently positioned next to the visitation rooms waiting to enter. Consequently, the defendants' discovery can be visible to DOC staff, visitors, and other inmates passing by if held up against the plexiglass for the defendant to review, according to Franklin.[7] As noted *supra*, it is difficult when counsel can only show their client one document at a time when attempting to familiarize clients with information and documents which are related. This demonstrates that defendants need access to in-person visitation without a barrier to insure they are able to adequately review discovery with counsel privately. Visitation with a physical barrier does not provide the defendants with adequate discovery review.

Without adequate alternatives for discovery review for incarcerated defendants, courts must consider release of defendants pursuant to 18 U.S.C. § 3142(i), which provides that a judicial officer may "permit the temporary release of the person . . . to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Such release can endanger the public, should a defendant with a history of violence commit a new law violation. There is also the danger that a defendant released pursuant to 18 U.S.C. § 3142(i) may abscond.[8]

---

[7] Franklin provided a declaration stating that DOC personnel initially informed counsel that she could not meet with her client in a more private setting without a physical barrier to review discovery (*United States v. King*, Case 3:19-cr-00026-TMB-DMS, Dkt. 375). Further, Franklin reports that her efforts to remedy this problem have not been wholly successful (*United States v. King*, Case 3:19-cr-00026-TMB-DMS, Dkt. 376).

[8] Recently the defendant in *United States v. Grant* was ordered released so he could review discovery. He fled and had to be arrested by law enforcement (Case 3:21-cr-00003-RRB-MMS at Dkt. 175).

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                          25

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 25 of 31

### c. The cost of providing the defendants with in-person counsel visitation regardless of their vaccination status is not significant.

The Court is not persuaded that a policy without distinction between vaccinated and unvaccinated inmates would create significant additional risk to DOC inmates and staff, nor require a great expenditure of resources by the DOC. Other precautions such as in-person visitation with a physical barrier or in-person visitation without a barrier but subject to quarantine requirements make the distinction between vaccinated and unvaccinated inmates a negligible one.

Currently, if an unvaccinated inmate seeks an in-person visit without such barrier, he is subject to a 14-day quarantine—the same quarantine policy they have employed for newly remanded inmates. Given these protocols, inmates and DOC staff would not face "significantly less liberty or safety" by accommodating unvaccinated inmates with counsel visitation. *See Mauro*, 188 F.3d at 1062.

While deference is owed to prison administrators when their ability "to protect staff and detainees at the facility are at issue," that deference is not absolute. *See Bull*, 595 F.3d at 976. Here the record before the Court, including DOC's own policy decisions, demonstrates that providing unvaccinated inmates with in-person visitation without a physical barrier would not become a great risk to the DOC and DOC inmates.

### d. DOC's pre-injunction policy amounts to an exaggerated response as there are means of protecting inmates from COVID-19 without denying the defendant in-person counsel visitation.

It has been over a year since the DOC began restricting attorney in-person visitation. Evidence submitted to the Court demonstrates that currently, corrections facilities in all but four

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                      26

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 26 of 31

states permit in-person attorney visitation of some type.[9] The fact that so many other facilities are currently providing in-person visitation to inmates is evidence that it can be done without significant risks. *See Morrison*, 261 F.3d at 905. As mentioned *supra*, when asked if he had been in contact with other states that allow in-person counsel visitation, Dr. Lawrence, stated "I don't know which ones do and which ones do not allow consultation. I have consulted with, you know, colleagues in other states, and certainly on nation calls have talked to colleagues, but not about this particular issue of . . . consultation with attorneys coming into the facility" (Dkt. 282 at 199). This failure to consult with other facilities weakens the DOC decision-making team's pre-injunction assertion that in-person visitation cannot safely resume for unvaccinated inmates. Given the state preliminary injunction, the DOC has already developed a policy to provide in-person counsel visitation to all inmates and has successfully implemented those policies.

Resuming visitation has been so successful that DOC has voluntarily expanded its in-person visitation policy to non-legal visits with vaccinated inmates on April 19, 2021, and on April 28, 2021, the DOC opened public in-person visitation with a physical barrier to inmates regardless of vaccination status.[10] Given recent developments and DOC's current policies, depriving an unvaccinated inmate of in-person contact visitation with counsel now would be an exaggerated response to DOC's COVID-19 concerns.

//

//

---

[9] Def. Ex. D-3, research from The Marshall Project, updated on May 7, 2021. Retrieved from <https://www.themarshallproject.org/2020/03/17/tracking-prisons-response-to-coronavirus>.
[10] Alaska Dept. of Corrections, Press Release: DOC Fully Reopens Public Visitation, April 28, 2021, retrieved from <https://doc.alaska.gov/commish/pressreleases/DOC%20Press%20Release%20-%20DOC%20Fully%20Opens%20Visitation.pdf>.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                                    27

**2. The DOC's pre-injunction attorney visitation policy fails the *Bell* punitive test for pretrial detainees.**

The in-person counsel visitation restrictions for unvaccinated inmates amounts to a violation of the defendants' due process rights. DOC administrators have not expressed any intent to punish by distinguishing between vaccinated and unvaccinated inmates in their visitation policies. In fact, Dr. Lawrence testified that it was important to avoid coercing inmates into receiving the vaccine by withholding certain privileges (Dkt. 282 at 231).

However, "in the absence of evidence of express intent, [courts] may infer an intent to punish if the restriction or condition is not reasonably related to a legitimate government objective or is excessive in relation to the legitimate governmental objective." *Doe*, 878 F.3d at 714. As mentioned *supra*, the DOC's pre-injunction policy to deny unvaccinated inmates in-person counsel visitation is an exaggerated response to COVID-19 concerns. The current DOC policy demonstrates that unvaccinated inmates can either meet with their attorney with a physical barrier or meet without a barrier but undergo a 14-day quarantine before returning to general population without posing a significant risk to other inmates. In addition to these safeguards, attorneys are required to wear masks, submit to COVID screenings, and surfaces are cleaned between visits. Given these precautions, a complete denial of any in-person access to counsel without adequate alternatives amounts to an excessive response, not reasonably related to DOC's asserted COVID-19 concerns. Therefore, the pre-injunction policy fails the *Bell* test for pretrial detainees and amounts to a violation of the defendants' Fifth Amendment rights to due process.

//

//

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                28

**C. The Record Does Not Establish That DOC's Discovery Review Procedures Infringe Upon the Defendants' Constitutional Rights If In-Person Visitation Remains Available.**

Defendant Moi requests that the Court direct DOC "to develop a policy and procedure governing all institutions regarding inmates' access to discovery review computer and case related materials that includes specific time limitations" (Dkt. 294 at 2). As mentioned *supra*, the defendants demonstrated that the DOC's new discovery review procedures were not an adequate alternative to in-person discovery review with counsel. However, the defendants do not establish that these procedures themselves have impermissibly deprived them of their constitutional rights under *Turner* or *Bell* if in-person contact visitation resumes. Resuming and continuing in-person visitation for vaccinated and unvaccinated inmates provides the defendants with the ability to review discovery with counsel in-person.

As the DOC points out, the defendants' access to Microsoft Teams video-conferencing computers and private discovery review computers was discussed in the context of whether those procedures were adequate alternatives to in-person visitation and discovery review with counsel (Dkt. 297 at 3). While those alternatives were insufficient, resuming in-person visitation with and without a barrier would relieve those discovery review difficulties. As mentioned *supra*, the Court has recently become aware that in-person visitation with a physical barrier in certain rooms at ACC is not sufficiently private to allow for confidential discovery review with counsel. In those situations, it is vital that defendants also have the option of in-person visitation without a barrier for the purposes of reviewing discovery (subject to quarantine if the defendant or attorney is unvaccinated).

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                                               29

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 29 of 31

Given that the defendants have not established that the DOC's discovery review procedures violate the defendants' constitutional rights regardless of whether in-person visitation is reinstated, the defendants' request for a Court visit to DOC facilities "to conduct an on-site visit . . . of the various discovery and inmate computer access locations" is not warranted. The Court's recommendation that in-person visitation with a physical barrier and in-person visitation without a barrier be available to inmates regardless of their vaccination status should relieve the defendants' issues with discovery review.

## E.  CONCLUSION

For the foregoing reasons, the Court recommends that the District Court **GRANT in part and DENY in part** defense motion to compel reasonable access to counsel and discovery. The Court finds that DOC's pre-injunction counsel visitation policy's distinction based on an inmate's vaccination status violates the defendants' Sixth Amendment rights to counsel and Fifth Amendment rights to due process, therefore the Court recommends that the District Court direct the DOC to allow in-person contact attorney-client visitation to inmates regardless of their vaccination status. The DOC should accommodate requests for (1) in-person counsel visitation with a physical barrier and (2) requests for in-person counsel visitation without a barrier within 24 hours, subject to facility capacity limitations. Inmates should not be denied visitation absent good cause, such as an attorney or their client presented signs of COVID-19. When in-person visitation without a physical barrier is denied, DOC is directed to keep a record of the denial and the reasons for such denial.

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 30

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 30 of 31

The Court recommends that the District Court deny the defense's request for a Court visit to DOC facilities and deny the defense's request that the Court order the DOC to develop new private discovery review procedures.

The Court wishes to note and commend the DOC for the steps taken to protect inmates from COVID-19 during the past year. The DOC also made significant efforts to ensure some communication continued between attorneys and their clients and that there was a new procedure implemented to review discovery during that difficult time when isolation was necessary to prevent illness and death. However, based on the record before the Court, in-person visits without a physical barrier between attorneys and their clients can now be safely resumed, regardless of vaccination status, thus ensuring defendants' Sixth Amendment rights are protected and there is an opportunity for adequate pretrial preparation.

DATED this 7th day of June, 2021 at Anchorage, Alaska.

/s/Deborah M. Smith
CHIEF U.S. MAGISTRATE JUDGE

*United States v. Shanholtzer et al.*
3:19-cr-00112-TMB-DMS
R&R re Mtn for Access to Counsel                                                                31

Case 3:19-cr-00112-JMK   Document 301   Filed 06/07/21   Page 31 of 31