**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>MATTHEW WILSON MOI,<br>a/k/a "Matt Matt"<br><br>        Defendant. | Case No. 3:19-cr-00112-TMB-SAO-2<br><br><br>ORDER ON DEFENDANT MOI'S<br>MOTION FOR NEW TRIAL<br><br>(DKT. 669) |

## I.  INTRODUCTION

The matter comes before the Court on Defendant Matthew Wilson Moi's Motion for New Trial (the "Motion").[1] A jury found Moi guilty on all counts charged:

> **Count 2**, Drug Conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846;
>
> **Count 3**, Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h);
>
> **Count 4**, Using a Firearm to Commit Murder in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c) and (j); and
>
> **Count 5**, Killing in Furtherance of a Continuing Criminal Enterprise, in violation of 18 U.S.C. § 848(e).[2]

Moi now seeks a new trial under Federal Rule of Criminal Procedure ("Rule") 33(a) as to only Counts 4 and 5 (collectively the "Homicide Counts").[3] In the Motion, Moi identifies the following instances where "a miscarriage of justice occurred" that warrant a new trial: (1) a verdict was "returned contrary to the evidence presented in the courtroom," and (2) two evidentiary rulings

---

[1] Dkt. 669 (Motion).

[2] Dkt. 621 (Jury Verdict).

[3] Dkt. 669; Dkt. 669-1 (Excerpts of Record); Dkt. 670-1 (Additional Excerpts of Record).

1

were erroneous, and independently and cumulatively warrant a new trial.[4] The Government opposes the Motion.[5] The Court heard oral argument on the Motion on August 8, 2022.[6]

Granting a new trial is an extraordinary measure that the Court does not take lightly.[7] Because this is an exceptional case where the evidence presented at trial preponderates so heavily against guilt on the Homicide Counts that a serious miscarriage of justice may have occurred, the Court **GRANTS** the Motion as set forth below.

## II.     BACKGROUND

Jordan Shanholtzer and his associates—Moi, Kyle Dwiggins, Myrick Elliot, Kenneth Ford, Marvin Nelson, Isaiah Roderick, and Ebon "Guzzo"[8] Moore—were part of a criminal enterprise distributing heroin and methamphetamine in Alaska (the "Enterprise").[9] In September 2019, law enforcement intercepted a package of heroin bound for Wasilla that ultimately led to the unraveling of the Enterprise and the subsequent indictment of six of the eight known co-conspirators. Dwiggins and Guzzo remain the only unindicted co-conspirators.[10]

---

[4] Dkt. 669 at 2.

[5] Dkt. 686 (Opposition); Dkt. 686-1 (Excerpts of Record).

[6] Dkt. 704 (Minute Entry).

[7] The undersigned cannot recall granting a motion for a new trial pursuant to Rule 33 prior to this case.

[8] The Court refers to Ebon Moore as "Guzzo" to minimize confusion because a trial witness, Jeff Moore, shares the same surname. *See, e.g.*, Dkt. 669-1 at 161.

[9] Dkt. 669-1 at 153, 156–62; 179, 198–200.

[10] *See* Dkt. 669-1 at 15–19; Dkt. 189 (Superseding Indictment) (absence); *see also* Dkt. 582 at 7–8 (Transcript of Trial Day 4) (Dwiggins testifying that he was never charged with a crime in connection with the Enterprise).

2

After a complex three-week drug conspiracy and murder trial, and only five hours of deliberation, a jury found Moi guilty on all counts.[11] The Government's case that Moi killed Navarrow Andrews centered on alleged confessions Moi made to two co-conspirators—one to Dwiggins, a drug dealer and distributor,[12] and another to Shanholtzer, the leader of the Enterprise.[13] At issue now is whether Dwiggins and Shanholtzer were credible witnesses and, in the absence of their testimony, whether the circumstantial evidence supports the conclusion that Moi murdered Andrews.

Moi argues that he is entitled to a new trial on the Homicide Counts because "[t]here is not sufficient evidence in the record to support a finding that Moi" murdered Andrews.[14] Moi contends that the verdict on the Homicide Counts was contrary to the evidence for the following seven reasons:

(1) Moi and Andrews were friends;[15]

(2) no forensic evidence presented at trial connected Moi to Andrews's murder;[16]

(3) no eyewitness identified Moi or someone resembling him at the crime scene;[17]

---

[11] Dkt. 620 (Minute Entry); Dkt. 621; Dkt. 626 (Special Verdict Form).

[12] *See* Dkt. 669-1 at 87, 93.

[13] *See id.* at 163.

[14] Dkt. 669 at 58.

[15] *Id.* (citing Dkt. 669-1 at 350) (witness stating Andrews treated Moi like a "brother"); *see also* Dkt. 669-1 at 220 (separate witness agreeing that Moi and Andrews were "friends").

[16] Dkt. 669 at 58–61 (citing "no evidence that Moi was ever inside the [Volkswagen where Andrews was murdered]" and "no evidence that Moi used the [phone found at the crime scene] on April 8, 2019").

[17] *Id.* at 61 (arguing limited eyewitness testimony presented at trial does not match Moi).

3

(4) no evidence connected Moi to the location of the crime scene;[18]

(5) the people to whom Moi allegedly confessed, Dwiggins and Shanholtzer, are not credible;[19]

(6) evidence presented at trial showed that Guzzo committed the murder;[20] and

(7) the homicide investigation was inadequate.[21]

The Government opposes the Motion and argues that Moi's conviction is supported by evidence that "Moi separately confessed to committing the murder to two different witnesses, and the key details of those confessions were corroborated by statements from other witnesses, as well as by phone records [from members of the Enterprise], physical evidence [including the phone found at the scene of the crime ("Crime Scene Phone")] and Moi's own conduct after the murder."[22]

Separately, Moi argues that the Court improperly admitted two pieces of evidence that independently and cumulatively warrant a new trial.[23] First, Moi asserts that the Court erred when

---

[18] *Id.* at 62.

[19] *Id.* at 62–71 (arguing both Dwiggins and Shanholtzer are unreliable witnesses).

[20] *Id.* at 71–75 (arguing the evidence shows Guzzo (1) had a "strong connection" to the crime scene; (2) was "a trusted Shanholtzer lieutenant"; (3) had "historically . . . helped Shanholtzer when Moi had failed"; (4) was not friends with Andrews and was detached from the situation; (5) used the phone found at the crime scene on the day of Andrews's death; (6) "matched the description of the person seen fleeing from the scene"; and (7) "was rewarded by Shanholtzer with a more prominent place in the organization after the murder"); *see also id.* at 62 (contending that "evidence at trial established a concrete connection between an address in the flight path of the suspect—5218 Taku Drive—and [Guzzo]" and noting that "[Guzzo] had this address tattooed on his neck").

[21] *Id.* at 75–78.

[22] Dkt. 686 at 20.

[23] Dkt. 669 at 78–86.

it refused to strike Shanholtzer's "unresponsive hearsay testimony" during cross-examination, in which Shanholtzer stated that a number of people had called him to tell him that Moi was the last person seen with Andrews on April 8, 2019.[24] Second, Moi argues the Court erred when it permitted Agent Maria Boothroyd to present "irrelevant testimony" regarding coordinates from Dwiggins's phone records that she had entered into Google Maps.[25]

The Government argues that the Court's evidentiary rulings were correct, but that even if the Court erred, the issues are "of little significance in light of the way the case was litigated at trial."[26]

## III.    FACTS

In early April 2019, a package containing heroin addressed to Andrews disappeared in Anchorage.[27] In the days immediately following the loss, Andrews was murdered.[28] For the purposes of this Order, the Court focuses its review on the events surrounding the April 2019 shipment and Andrews's murder.

### A.  The Enterprise

Shanholtzer commanded the Enterprise, both when he resided in Alaska and remotely, after leaving Alaska sometime near the end of 2018.[29] With Shanholtzer's departure, Moi briefly

---

[24] *Id.* at 2, 79–82.

[25] *Id.* at 2, 82–86.

[26] Dkt. 686 at 2.

[27] Dkt. 669-1 at 46, 51, 66.

[28] *Id.* at 64–66, 246.

[29] *Id.* at 44, 100, 163–64 (explaining that after completing probation, Shanholtzer moved to Phoenix, Arizona "to get away from everything"), 197, 221, 287.

assumed responsibility for operations in Alaska and was considered second-in-command.[30] But that changed a few months later in February 2019, when allegations surfaced that Moi had mismanaged the Enterprise's money.[31] As a result, Shanholtzer directed that money be delivered to Guzzo instead of Moi.[32] Up until this point, Guzzo's role in the Enterprise had been limited to waiting for packages to be delivered and "help[ing] [the Enterprise] sell the drugs."[33]

### B. A Shipment of Heroin Sent to Andrews Goes Missing in Spring 2019

At the beginning of April 2019, the Enterprise organized a shipment of five kilograms of heroin to Alaska. The shipment was addressed to Andrews, Moi's close friend.[34] But on April 6, 2019, when Moi went to retrieve the heroin from Andrews's mailbox, the package was missing.[35] Initially, Moi suspected the package had unintentionally been placed into the wrong mailbox.[36] But after a weekend of searching for the heroin package, Moi reportedly concluded that somebody had taken it.[37] Shanholtzer, however, testified that he did not believe Andrews had stolen the

---

[30] *See id.* at 44 (describing Moi as leader in Alaska after Shanholtzer left); *see also id.* at 164 ("[Moi]. . . just started taking over everything, all the drugs."), 157 ("[Moi] had the drugs and [Shanholtzer] had the people."), 233 ("It was always [Shanholtzer] directing and Matthew Moi was the lieutenant, still calling almost all of the shots, like [Shanholtzer], telling the guys in Anchorage what to do.").

[31] *Id.* at 167–68, 170–71.

[32] *Id.* at 170.

[33] *Id.* at 162.

[34] *See id.* at 220, 350.

[35] *See id.* at 183–84, 203.

[36] *Id.* at 183–84.

[37] *Id.* at 47, 186; *see also id.* at 214 (describing search efforts as "driving around" and "knocking on people's doors, asking if they received a package").

6

package because "[Andrews] wasn't like that. Like, he didn't sell drugs or anything."[38] Instead, Shanholtzer believed Andrews's girlfriend had taken the heroin.[39]

### C. The Enterprise Formulates a Plan to Retrieve the Missing Heroin

Once Moi determined that the heroin had likely been stolen, the recovery strategy shifted. Shanholtzer claims he "told [Moi] to find out, figure it out."[40] Around 3:00 PM the following Monday, April 8, 2019, Moi updated Dwiggins that the package was still missing.[41] Dwiggins then testified that Moi directed him to "get . . . a car" and bring it to Anchorage.[42] According to Dwiggins, he did not know why Moi wanted a car.[43] However, Dwiggins also testified that Shanholtzer told him he could deduct the cost of the car from an outstanding debt Dwiggins owed to Shanholtzer.[44] That afternoon Dwiggins hastily purchased a "beat-up" Volkswagen from a local mechanic.[45] During the transaction, Dwiggins told the mechanic that "it didn't matter" that the Volkswagen did not have a title because the car "only needed to make it to Anchorage one time."[46]

---

[38] *Id.* at 187.

[39] *Id.* at 188.

[40] *Id.* at 187; *see also* Dkt. 669 at 15–16 (Shanholtzer and Moi spoke at least four times on April 8, 2019, between 2:39 and 2:59 PM).

[41] Dkt. 669-1 at 67.

[42] *Id.* at 47–48, 108.

[43] *Id.* at 108–09.

[44] *Id.* at 104, 114; *but see id.* at 205 (Shanholtzer claiming he did not recall telling Dwiggins it was okay to spend Shanholtzer's money to buy a car).

[45] *Id.* at 47–48, 68–69; *see also id.* at 375.

[46] *Id.* at 375.

Before leaving, Dwiggins also warned: "This never happened."[47] After this interaction, the mechanic became "concerned" and decided to "wipe down the car because [he] didn't want to be implicated" in any potential criminal activity.[48]

Once the car was ready, Dwiggins directed Jeff Moore, his subordinate in the Enterprise,[49] to drive the car to Anchorage and "park it on the street . . . close to 11th and Ingra," where, according to Dwiggins, Moi had instructed the car be parked.[50] Dwiggins testified that he was in Wasilla and did not travel to Anchorage that day.[51] At 6:36 PM, Dwiggins texted Moi images containing the location of "the car and the key."[52] Phone records show that two minutes later Moi called Guzzo at 6:38 PM.[53] Guzzo called Moi back at 6:48 PM and again at 7:02 PM.[54]

### D. The Hours Leading Up to Andrews's Murder

After communicating with fellow Enterprise members throughout the day of the murder, Moi's and Guzzo's primary phones went quiet. Moi's primary phone ceased making and receiving voice calls and text messages between 8:09 PM and 11:24 PM but continued to use data.[55] During

---

[47] *Id.* at 298, 378.

[48] *Id.* at 375–78.

[49] *See id.* at 64 (Dwiggins describing Jeff Moore as an "'I ask him to do anything, he's going to do it,' type of person").

[50] *Id.* at 48, 69–70.

[51] *Id.* at 49.

[52] *Id.* at 71.

[53] Dkt. 669 at 39 (citing Gov. Trial Ex. 247 at 94–95, 462–63).

[54] *Id.*

[55] *Id.* at 41 (citing Gov. Trial Ex. 23 at 39286) (showing Moi's phone was using data during the window when he was not receiving calls or text messages); *but see id.* at 21–22 (citing Def. Trial

a similar time frame, Guzzo's primary phone had a period of inactivity and an absence of outgoing calls, text messages, or data usage.[56]

During the same time period that both men's phones were inactive, the Crime Scene Phone, an iPhone that had been set up under Moi's Apple ID,[57] began making "calls and attempts and then connections" with Maryssa Poindexter's and Cheyenne Whybark-Marshall's phones.[58] Both women were close associates of Guzzo's—Poindexter a close friend and Whybark-Marshall a romantic partner and mother to Guzzo's children—and both had received calls and messages earlier that day from Guzzo's primary phone.[59] The evidence revealed that Moi had never called either woman.[60] Data collected from the calls made to Poindexter and Whybark-Marshall by the Crime Scene Phone showed that between 8:00 PM and 9:15 PM the Crime Scene Phone traveled from west Anchorage to east Anchorage, around where Andrews was later murdered.[61]

---

Ex. D-39 at 8–9) (Dwiggins's phone records reveal he messaged Moi at 10:25 PM on the night of the murder); Dkt. 669-1 at 78–79 (Dwiggins testifying that he also messaged Moi at 11:19 PM, then spoke to him by video shortly afterward).

[56] Dkt. 669 at 41–42 (citing Gov. Trial Ex. 23 at 38408, 39358; Gov. Trial Ex. 247 at 225).

[57] *See* Dkt. 669-1 at 385 (explaining that multiple devices may be associated with a single Apple ID and referencing the fact that if a phone is logged in using a particular Apple ID this does not necessarily mean the person associated with the Apple ID has recently used the phone).

[58] *Id.* at 295.

[59] *Id.* at 391–92; Dkt. 669 at 36–40 (citing Gov. Trial Ex. 247 at 94–95, 462–63).

[60] *See* Dkt. 669-1 at 295; *see also id.* at 393 (Whybark-Marshall testifying that she had never spoken to Moi on the phone).

[61] *See* Dkt. 669 at 32–34 (citing Gov. Trial Ex. 272 at 9–10).

Andrews left his home at around 10:00 PM.[62] It is unknown why Andrews left or who he intended to meet.[63] But between 10:18 PM and 10:32 PM, there were five calls lasting from 11 seconds to one minute and 38 seconds between Andrews and the Crime Scene Phone.[64]

During this same time, other members of the Enterprise were in communication with each other. At 10:23 PM, Dwiggins sent Shanholtzer an instant message ("IM"),[65] telling "him to hit me back ASAP."[66] Two minutes later, Dwiggins sent an IM to Moi, asking: "You good."[67] According to Dwiggins, Shanholtzer and Dwiggins spoke around that time, and Shanholtzer explained to Dwiggins, "the package isn't where it was supposed to be at and it's like someone has took it."[68] But Dwiggins denied that Shanholtzer told him any details about Moi or the car.[69] At 10:28 PM, Dwiggins messaged his girlfriend, stating that he was trying to be safe, but "shit hit

---

[62] Dkt. 669-1 at 133.

[63] *See id.*

[64] Dkt. 669 at 42 (citing Gov. Trial Ex. 20 at 8–9).

[65] Not all the communications between members of the Enterprise are captured in cell phone records. When applications like FaceTime or WhatsApp are used, IMs are sent and phone records capture only the data usage and general location information, not the details of communications or precise location information. *See, e.g.*, Dkt. 615 at 28–30, 38, 62–63 (Transcript of Trial Day 3) (testimony from FBI Special Agent Sean Kennedy).

[66] Dkt. 669-1 at 72; Dkt. 669 at 21 (citing Def. Trial Ex. D-39 at 8–9).

[67] Dkt. 669-1 at 73; Dkt. 669 at 21 (citing Def. Trial Ex. D-39 at 8–9).

[68] Dkt. 669-1 at 72–74; *see also id.* at 118–19 (indicating discrepancies between Dwiggins's testimony and other evidence presented at trial, which contradict that Dwiggins and Shanholtzer spoke over the phone around this time), 119 (Dwiggins testifying that he may have deleted certain records of FaceTime calls from his phone).

[69] *Id.* at 73.

the fan and it's crazy right now."[70] At trial, Dwiggins's only explanation for this message was that "[t]he package [was] missing."[71]

At 10:38 PM, the Volkswagen that Dwiggins had procured was seen on camera turning into the alleyway behind Taku Drive.[72] At 10:39 PM, gunshots were reported near Taku Drive and, at that same time, Dwiggins sent a cryptic IM to his girlfriend: "IBSABYA ILBNA RFBS EI IB CBE XYBD DKHL KHJJAYI!"[73] Decoded, the message reads: "Someone stole from us, so you know what happens!"[74] By the time law enforcement responded, the suspect or suspects were gone and Andrews's body was found in the middle of Cowboy Way, a street that parallels Taku Drive.[75] The Crime Scene Phone was discovered on the ground near the Volkswagen, which was left at the crime scene.[76]

Little was observed about the suspect. Eyewitnesses reported the color of the suspect's clothing, the direction of the suspect's flight path, and an estimate of the suspect's height—between 5'4" and 5'6".[77] In addition to the Crime Scene Phone and the Volkswagen, law enforcement recovered shell casings, human hair, a lollipop stick, blood stains, and a light bulb

---

[70] Dkt. 669-1 at 74; Dkt. 669 at 22 (citing Def. Trial Ex. D-39 at 8–9).

[71] Dkt. 669-1 at 74, 118.

[72] Dkt. 686 at 7; *see also* Dkt. 686-1 at 111–12.

[73] Dkt. 669 at 21–22 (quoting Def. Trial Ex. D-39 at 8–9); *see also* Dkt. 669-1 at 75.

[74] Dkt. 669-1 at 121; Dkt. 613 at 37–45 (Transcript of Day 6).

[75] *See id.* at 134, 310–11; Dkt. 669 at 25.

[76] Dkt. 669-1 at 136–37; Dkt. 669 at 27; Dkt. 686-1 at 163–64.

[77] Dkt. 669 at 26 (citing Def. Trial Ex. D-45).

11

from the crime scene.[78] Certain significant items of this evidence were not tested by the crime lab.[79]

### E. The Hours and Days Following Andrews's Murder

After speaking to Shanholtzer earlier that evening, Dwiggins messaged Moi at 11:19 PM, and when Moi answered with "[w]hat up," Dwiggins responded "What's up with you? Got me worried over here."[80] Dwiggins testified that he had not heard from Moi since Jeff Moore dropped off the Volkswagen in Anchorage and that "[Moi] end[ed] up FaceTiming [him]," during which Dwiggins observed that "it look[ed] like [Moi] just got out of the shower."[81] According to Dwiggins, the two only discussed the disappearance of the package.[82]

Dwiggins further testified that a few days after Andrews's murder, Moi had asked Dwiggins to bring him cash.[83] According to Dwiggins, he met Moi outside of a hotel in his car, where he claims Moi confessed to the murder.[84] Dwiggins testified that at the meeting, Moi told him "the package got stolen" and "[Moi] went up and talked to the kid[, Andrews,] and . . . shot

---

[78] Dkt. 669-1 at 138, 140–41.

[79] *See* Dkt. 669 at 27–29 (the lollipop stick and human hair found in the Volkswagen were not forwarded to the crime lab for DNA testing, nor was the Crime Scene phone tested for DNA or fingerprints, despite appearing to have oily fingerprints across its screen).

[80] Dkt. 669-1 at 78.

[81] *Id.* at 79.

[82] *Id.*

[83] *Id.* at 49–50.

[84] *Id.* at 49–51; *see also id.* at 83 (Dwiggins testified, "He just goes into pretty much say that he shot him").

him" because Andrews "had stole[n] . . . the package."[85] Dwiggins then testified that Moi said that he "ran off and got a ride out of there," leaving the Volkswagen at the murder site.[86] Dwiggins stated that it was at this meeting that he first learned about both the Volkswagen's connection to Andrews's death and Moi's role in the murder.[87]

The news broke about Andrews's death the day after the murder.[88] Sometime during the following week, Moi began making plans to leave Alaska.[89] According to Shanholtzer, he did not speak to Moi for "[a] couple days after" Andrews's death.[90] But when the two eventually spoke, Shanholtzer claims that Moi asked for money because "he needed to get out of Anchorage . . . [b]ecause he killed [Andrews]."[91] Roderick, another member of the Enterprise, testified that Moi left Alaska within a week of Andrews's death.[92]

### F.   The Months Following Andrews's Murder

After Moi left Alaska, the Enterprise's Alaska leadership changed again. This time, Dwiggins, Guzzo, Ford, and Roderick assumed leadership roles.[93] Moi continued to work with the Enterprise and communicate with its members from the Lower 48. For example, one month after

---

[85] Dkt. 669-1 at 50–51; *see also id.* at 81–82.

[86] *Id.* at 83.

[87] *Id.* at 108–09, 50–51.

[88] *See id.* at 188; *see also id.* at 218.

[89] Dkt. 669 at 43; Dkt. 601 at 92–96 (Roderick's testimony).

[90] Dkt. 669-1 at 188–89.

[91] *Id.* at 190.

[92] Dkt. 601 at 92–96.

[93] Dkt. 669-1 at 99, 172, 197–98.

13

Moi's departure, Moi texted Roderick that "[w]e need to get back to work"[94] and also texted Dwiggins a message expressing his gratitude for "all that you do."[95] Shanholtzer remained in Arizona during this time period.[96]

### G. Dwiggins Implicates Moi in Andrews's Murder

On September 26, 2019, law enforcement detained Dwiggins after he received a package of heroin in the Matanuska-Susitna Valley.[97] Under questioning, Dwiggins implicated Moi in Andrews's murder.[98] This was not the first time Dwiggins had been questioned about the murder. Dwiggins had already spoken to law enforcement about the Volkswagen on two prior occasions in May 2019—once in-person and once over the phone with Detective David Cordie. In neither conversation did Dwiggins implicate Moi in Andrews's murder.[99] During Dwiggins's first conversation with Detective Cordie, he denied having purchased the Volkswagen altogether and asked for immunity.[100] When Detective Cordie later told Dwiggins that he could not offer him immunity without additional information, Dwiggins then told Detective Cordie that Moi had

---

[94] *See* Dkt. 601 at 101.

[95] Dkt. 686-1 at 179 (Moi texted Dwiggins on May 17, 2019, "Say bro real shit I'm so grateful for you thank you for all that you do you will forever be my big bro if you ever need me I'll drop everything and come□□ I appreciate you and your family for opening the door for me no matter the time □ I just want you to know that I'm grateful bro□□ real shit thank you from the bottom of my heart to the top of yours□"); *see also* Dkt. 686-1 at 46.

[96] Dkt 669-1 at 43, 163.

[97] Dkt. 669-1 at 41, 88.

[98] *Id.* at 41.

[99] *Id.* at 110, 113.

[100] *Id.* at 110; *see also id.* at 301.

Case 3:19-cr-00112-JMK-SAO   Document 708   Filed 11/18/22   Page 14 of 28

contacted Dwiggins "and wanted to buy a car."[101] Dwiggins then proceeded to explain that he had

purchased a car and sold it to Moi.[102] Dwiggins asked the detective not to investigate his alibi.[103]

### H. Shanholtzer Implicates Moi in Andrews's Murder

According to Shanholtzer, while he was in Arizona, both Moi and Guzzo told him about

their involvement in Andrews's murder. Shanholtzer testified that on one occasion, he and Moi

met at his home in Phoenix. During their conversation, Moi allegedly told Shanholtzer that

> [he] pulled the gun on [Andrews]. And [Andrews] said he would get
> it. He was like, I'll get it, I'll get it. And he said he tried to grab at
> him and he shot him. And I just asked him how you know it was for
> sure that he took it, you know.[104]

Shanholtzer further claimed Moi explained that after he shot Andrews, Guzzo picked Moi up and

the pair left.[105] Shanholtzer also testified that on a separate occasion, Guzzo told him that on the

night Andrews was killed, "[Moi] told [Guzzo] to wait, wait here, and then [Guzzo] said he heard

gunshots and [Moi] just hopped in and they drove off."[106] Shanholtzer did not disclose Guzzo's

---

[101] *Id.* at 110–11.

[102] *Id.* at 111.

[103] Dkt. 669 at 46; Dkt. 669-1 at 301–02.

[104] Dkt. 669-1 at 194.

[105] *Id.* at 195.

[106] *Id.* at 196.

involvement in Andrews's murder until Shanholtzer began cooperating with law enforcement in November 2021.[107]

Moi was eventually arrested in Los Angeles on October 2, 2019.[108]

## IV. LEGAL STANDARD

Rule 33 permits a "court [to] vacate any judgment and grant a new trial if the interest of justice so requires."[109] "[A] district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal."[110] When deciding a motion for new trial, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses."[111] As a result, there may be circumstances where "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."[112] In these circumstances, the district court "may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."[113]

---

[107] Dkt. 669 at 53; *see also* Dkt. 669-1 at 233–34. Shanholtzer filed a Notice of Intent to Change Plea on November 1, 2021. Dkt. 388 (Shanholtzer Notice of Intent to Change Plea).

[108] Dkt. 669-1 at 60.

[109] Fed. R. Crim. P. 33(a).

[110] *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000) (quoting *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992)).

[111] *Id.* at 1097 (citing *Alston*, 974 F.2d at 1211).

[112] *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

[113] *Id.* (quoting *Alston*, 974 F.2d at 1211).

16

But such motions "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'"[114]

## V. DISCUSSION

### A. *The Evidence is Contrary to the Verdict*

This is one of those rare, exceptional cases where the evidence presented at trial preponderates sufficiently heavily against the verdict that the Homicide Counts should be submitted for determination by another jury.[115] In light of the absence of reliable evidence that Moi murdered Andrews, a serious miscarriage of justice may have occurred, prompting the Court to grant a new trial on these issues.

#### 1. Dwiggins and Shanholtzer Lack Credibility

Dwiggins's and Shanholtzer's testimony was crucial to the Government's case against Moi. Yet despite ample evidence suggesting that both men had prior knowledge of or bore some responsibility for the plan that led to Andrews's murder, neither conceded as much.[116] The evidence strongly suggests that both men had significant motive and self-interest to lie. Dwiggins's and Shanholtzer's testimony appeared to be self-serving, particularly in the absence of other corroborating testimony or evidence connecting Moi to Andrews's murder. Based upon the

---

[114] *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (quoting 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, Criminal § 553 at 487 (1969)).

[115] *See United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) ("Setting aside a jury's guilty verdict in the interests of justice may be appropriate under circumstances where the evidence brought forth at trial may tangentially support a guilty verdict, but in actuality, 'preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred.'" (quoting *Lincoln*, 630 F.2d at 1319).

[116] *See* Dkt. 669-1 at 50 (Dwiggins testified that, before Moi's alleged confession to Dwiggins, he did not know what had happened on April 8th, the night Andrews was murdered); *see also id.* at 196 (Shanholtzer testified that he did not know that Andrews was going to get killed).

evidence presented at trial, Dwiggins, in particular, presents as a practiced prevaricator. The questions surrounding Dwiggins's and Shanholtzer's credibility greatly trouble the Court, as explained below.

Dwiggins's credibility was undermined by his documented pattern of deception. Dwiggins initially denied that there was any coded meaning to the cryptic IM he sent at the same moment that Andrews had been shot.[117] But on cross-examination, the message was decoded to read: "Someone stole from us, so you know what happens!"[118] When pressed about his earlier denial of the message's meaning, Dwiggins's new explanation was that he was prompted to send this cryptic IM shortly after receiving a call from Shanholtzer telling him that someone had stolen from the Enterprise.[119] This explanation is in direct conflict with Dwiggins's prior testimony, given Dwiggins had spent the previous weekend searching for the missing heroin, and knew that, as of that afternoon, the heroin had still not been found.[120] Further, despite feigning ignorance of a plan to retaliate against the person responsible for the missing shipment, Dwiggins both procured the Volkswagen and had it delivered to a location near where Andrews was later murdered and where

---

[117] *Id.* at 75 (when asked the significance of the IM, Dwiggins responded, "[i]t's supposed to be like a cryptic quote thing or something, apparently, is what I was trying to send"); *see also id.* (when asked if the IM had any coded meaning, Dwiggins responded: "I don't believe so." Then when asked why he sent the IM, Dwiggins responded, "I have no idea" and "[i]t's probably because I was drunk and just being a jerk.").

[118] Dkt. 613 at 37–45.

[119] *See* Dkt. 669 at 21–22 (Dwiggins's phone record reflects an IM sent to Shanholtzer at 10:23 PM and a call at 10:41 PM, which lasted for twenty seconds); Dkt. 613 at 46–47 (Dwiggins states that he had spoken to Shanholtzer earlier via FaceTime and learned that "something got stolen." This FaceTime is not reflected in Dwiggins's call records).

[120] Dkt. 582 at 111–14 (Dwiggins testifying about his communication with Moi regarding the missing package and that Dwiggins had then visited Anchorage with Jeff Moore to look for the missing package).

the vehicle was ultimately abandoned. Even the mechanic who sold him the car was concerned that, based on Dwiggins's statements, the car might be used for criminal activity.[121] Moreover, on the night of Andrews's murder, Dwiggins demanded that his girlfriend "[d]elete [her] messages," including his cryptic message foreshadowing a plan to retaliate against Andrews.[122]

Dwiggins's credibility was further undermined when his own brother testified that Dwiggins could not be trusted.[123] Dwiggins himself admitted that he often lied—lied about the quantity of drugs he had, his whereabouts, who he was with, and whether he used drugs.[124] Dwiggins also admitted that he lied about the places where he deposited money and sent packages, and to the people to whom he dealt drugs.[125]

In line with this deceptive behavior, Dwiggins's story changed again. Dwiggins's friend, Hailee Hayes, testified that in August 2019, Dwiggins "started crying" and was "extremely emotional" when he confided in her that he had "witnessed some bad shit and it was bothering him."[126] Dwiggins admitted to Hayes that he had, in fact, been present for Andrews's murder, in

---

[121] *See* Dkt. 669-1 at 375–78 (the mechanic testified that "the things leading up to the end of the sale [of the Volkswagen] made [him] nervous" because Dwiggins stated "he didn't need a title" since the car "only needed to make it to Anchorage one time," and also warned the mechanic that "this never happened." Because of this, the mechanic stated that he "wiped down the car [for fingerprints] because [he] didn't want to be implicated in anything they were involved in.").

[122] *Id.* at 76; *see also id.* at 387 (Hershey Haney, Dwiggins's girlfriend, testified that Dwiggins's instruction to delete her text messages "was extremely odd" and it was the first time Dwiggins had made such a request).

[123] Dkt. 669-1 at 349.

[124] *Id.* at 94–95.

[125] *Id.* at 94–95.

[126] *Id.* at 356–57.

19

direct contradiction of his testimony at trial.[127] In short, nothing in Dwiggins's contradictory statements and testimony demonstrates reliability as a witness.

Shanholtzer's credibility is similarly concerning. Like Dwiggins, Shanholtzer denied orchestrating, joining, or knowing of any retaliatory plan to be carried out by his Enterprise. Shanholtzer's testimony, that he did not learn of Andrews's death until the next day, is also difficult to square with the phone records showing that he and Dwiggins were in regular communication on the night of the murder.[128] Further, Shanholtzer's claimed ignorance of any plans involving Andrews contradicts testimony and phone records that show Shanholtzer's Enterprise was "tightly knit" and "worked together," particularly in the days and hours leading up to Andrews's murder.[129] Despite significant gaps and omissions in the phone records, the fragments of the phone records presented at trial reveal that the Enterprise was in regular communication, particularly on the weekend that the heroin package went missing and the day Andrews was murdered.[130]

The numerous and critical discrepancies in Dwiggins's and Shanholtzer's proffered narratives, the absence of corroborating evidence to support their claims, and the self-interest inherent in their cooperation with the Government, create profound concern regarding their credibility. Consequently, their testimony, without additional corroboration, is suspect. Because

---

[127] *Id.* at 356–58. Dwiggins previously stated that on the night of the murder he had called Moi on FaceTime and it seemed like Moi had just gotten out of the shower. However, there was no FaceTime record on Dwiggins's phone. Dwiggins's admission to Hayes that he had been present at Andrews's murder contradicts this previous assertion. *See id.* at 79, 119.

[128] *Id.* at 188–89.

[129] *Id.* at 58–59.

[130] *E.g.*, *id.* at 185 (Shanholtzer instructed Moi to call Dwiggins to assist with the search for the package); *see also, e.g.*, Dkt. 669 at 15–17 (demonstrating Shanholtzer's frequent calls to Moi, Guzzo, Dwiggins, and other Enterprise members).

the foundation of the Government's case was built upon on Dwiggins's and Shanholtzer's testimony, and because Guzzo's role was not thoroughly investigated, Moi's guilt is not evident.

2.   The Circumstantial Evidence Does Not Show that Moi Killed Andrews

Absent Dwiggins's and Shanholtzer's testimony, the remaining circumstantial evidence presented at trial fails to establish that Moi pulled the trigger of the gun that killed Andrews. This circumstantial evidence includes: (1) Moi's efforts to locate the missing heroin package; (2) Moi's knowledge of the location of the Volkswagen; (3) the Apple ID logged in to the Crime Scene Phone; (4) Moi's flight from Alaska; and (5) the available forensic evidence.

   a.   *Moi's Efforts to Locate the Missing Package Do Not Show Moi Killed Andrews*

First, the Government implies that Moi's role in the conspiracy showed that he is a likely suspect in Andrews's murder.[131] But Moi's role in the Enterprise and his active efforts to retrieve the missing package of heroin do not necessarily indicate that Moi was the killer. Other members of the Enterprise also engaged in active efforts to retrieve the missing package and shared a motive to retrieve that package at all costs.[132]

   b.   *The Evidence Does Not Place Moi at the Scene of the Murder*

Second, while it is true that Moi received details from Dwiggins regarding the location of the Volkswagen and its key, there was no evidence that Moi himself went to retrieve the car or that he was ever in the car or at the murder scene. More importantly, the evidence showed that

---

[131] Dkt. 686 at 21.

[132] *E.g.*, Dkt. 669-1 at 204 (Shanholtzer testified that "we still owe for" the package, even after it went missing).

after Moi received the text message from Dwiggins regarding the location of the car, Moi called other members of the Enterprise, including Guzzo, potentially relaying that same information.[133]

### c. The Evidence Does Not Show that Moi Had the Crime Scene Phone

Third, the evidence does not show that Moi possessed the Crime Scene Phone on the day of the murder. Moi concedes the evidence "tended to show that [he] possessed the [C]rime [S]cene [P]hone a week prior to the homicide."[134] But the fact that Moi's Apple ID was used to set up the iPhone only shows that he had the phone at some point in time, not necessarily that he had it on the night of the murder. Further, the Crime Scene Phone's movement from west Anchorage to east Anchorage, near Andrews's home and the crime scene, does not reveal the identity of the actual person carrying the phone. In fact, the location data used to pinpoint the Crime Scene Phone's travel was collected from the numerous calls made to two women closely associated with Guzzo and not well known to Moi.[135] The evidence presented at trial did not show that Moi had ever called or sent text messages to Poindexter or Whybark-Marshall, with Whybark-Marshall testifying that she had never spoken to Moi on the phone.[136] In contrast, phone records showed that Guzzo was in regular contact with both Poindexter and Whybark-Marshall, including on the day of the murder. The investigation failed to conduct a forensic analysis of the Crime Scene Phone to identify the likely phone user[137] and failed to address evidence that the Crime Scene Phone and

---

[133] *See, e.g.*, Dkt. 669 at 39 (citing Gov. Trial Ex. 247 at 94–95, 462–463); *see also id.* at 41.

[134] *See id.* at 30.

[135] *Id.* at 31–32; Dkt. 669-1 at 295.

[136] Dkt. 669-1 at 294–95, 393.

[137] *See* Dkt. 669 at 28–30, 53.

Moi's primary phone made a simultaneous call on the evening of Andrews's murder, suggesting that a different person possessed each phone.[138]

Moreover, the theory that Moi may not have had possession of a phone set up under his Apple ID is consistent with the Government's witness testimony that drug traffickers sometimes use other individuals' phones "to obfuscate, disguise their personal involvement."[139] This was illustrated at trial when law enforcement executed a beeper warrant on one of Shanholtzer's three cell phones, only to find Roderick in possession of the phone.[140] For these reasons, the Crime Scene Phone does not clearly implicate Moi in Andrews's murder.

> d. *Moi's Departure from Alaska Does Not Necessarily Show Consciousness of Guilt*

Although Moi's flight from Alaska following the murder may appear suspicious, flight alone is not determinative of guilt. As the Ninth Circuit has plainly stated, "evidence of flight can be consistent with innocence."[141] Here, the evidence presented at trial shows Moi had some involvement in the events that led up to Andrews's murder and faced risk of prosecution given the Crime Scene Phone was linked to his Apple ID. Consequently, it would be improper to interpret Moi's flight as revealing consciousness of guilt on the Homicide Counts. Similarly, it would be

---

[138] *Id.* at 41 (explaining Moi placed a call at 8:09:29 that lasted 13 seconds, while the Crime Scene Phone was used to call Whybark-Marshall at the same time).

[139] Dkt. 669-1 at 1.

[140] *See id.* at 21–23.

[141] *United States v. Dixon*, 201 F.3d 1223, 1232 (9th Cir. 2000).

Case 3:19-cr-00112-JMK-SAO   Document 708   Filed 11/18/22   Page 23 of 28

improper to conclude that Moi's grateful message to Dwiggins the month after Andrews's murder was an admission of guilt. [142]

    *e.* *The Forensic Evidence Presented at Trial Does Not Implicate Moi*

Finally, the forensic evidence from the crime scene and the eyewitnesses' general descriptions of the suspect do not implicate Moi. None of the forensic evidence that was tested from the crime scene was linked to Moi.[143] Further, the general description of the suspect does not place Moi at the scene of the murder.[144] Given the contradictory and inconclusive nature of the circumstantial evidence related to the Homicide Counts, the possible presence of a second person at the crime scene, the suspicious gaps in the call records presented at trial, and the absence of direct evidence tying Moi to the actual crime scene—the circumstantial evidence alone is insufficient to sustain a conviction on the Homicide Counts.

    3.  <u>The Parties' Investigative and Litigation Strategies May Have Impacted the Verdict</u>

Although the parties diligently and vigorously litigated this case, some of their strategies may have influenced the trial results. For example, investigators did not learn until late in their investigation that Guzzo may have been involved in Andrews's murder, and once they did, the Government's lead investigator took only minimal steps to investigate Guzzo's role.[145] Then at trial, Moi claimed innocence of the drug counts despite significant evidence of his involvement in

---

[142] Dkt. 686-1 at 179.

[143] *See* Dkt. 669-1 at 138, 140–41; Dkt. 669 at 27–29.

[144] *See* Dkt. 669 at 26, 61.

[145] At trial, investigators had not interviewed Guzzo because his whereabouts were unknown. Agent Boothroyd testified that although she had secured Guzzo's call detail records, she had not reviewed his flight records, bank statements, or social media accounts. *Id.* at 53; *see also* Dkt. 669-1 at 233–35.

24

the Enterprise. As a result, the jury may have improperly imputed evidence related to the drug conspiracy to the Homicide Counts. These strategies could have influenced the jury's deliberations and explain why the jury deliberated for only five hours after a complex three-week trial.

A new trial is warranted because the evidence preponderates "so heavily against the verdict that it would be unjust to enter judgment."[146] In coming to this conclusion, the Court "harbor[s] 'a real concern that an innocent person may have been convicted.'"[147] Considering the lack of corroborating circumstantial evidence and the fact that two of the most culpable members of the Enterprise became cooperating witnesses against Moi, the Court must fulfill its "task of safeguarding the rights of criminal defendants" by returning the Homicide Counts to another jury.[148] For the foregoing reasons, the Court **GRANTS** Moi's Motion.

### B. Evidentiary Arguments

Because the Court finds that the evidence was contrary to the verdict and grants Moi a new trial on that ground, it briefly addresses Moi's remaining arguments regarding two of the Court's evidentiary rulings. For the reasons stated below, both Shanholtzer's and Boothroyd's testimony were properly admitted.

---

[146] *United States v. Martinez*, 924 F. Supp. 1025, 1028 (D. Or. 1996), *aff'd*, 122 F.3d 1161 (9th Cir. 1997) (quoting *United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992)); *see also Pimentel*, 654 F.2d at 545 (quoting 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, Criminal § 553 at 487 (1969)).

[147] *United States v. Fama*, 979 F. Supp. 2d 338, 341 (E.D.N.Y. 2013) (quoting *United States v. Guang,* 511 F.3d 110, 119 (2d Cir. 2007)).

[148] *Alston*, 974 F.2d at 1213 (quoting *United States v. Balough,* 820 F.2d 1485, 1491 (9th Cir. 1987)).

1.  <u>Shanholtzer's Testimony Was Properly Admitted</u>

Moi contends that the Court erred when it refused to strike Shanholtzer's testimony during cross-examination, arguing that a certain answer by Shanholtzer was unresponsive. The testimony at issue was elicited when defense counsel, in reference to a phone call Shanholtzer had with Guzzo the day after Andrews's murder, asked, "Sounds like you don't remember that call [with Guzzo]?"[149] To which Shanholtzer responded, "No. A lot of people were calling me, asking me, because they were saying [Moi] was the last person with [Andrews]."[150]

In light of the context of defense counsel's question, Shanholtzer's answer was responsive. Shanholtzer's response was not a binary "yes" or "no," but it was responsive as to whether Shanholtzer remembered receiving a call from Guzzo. Although Shanholtzer gave additional details as to why he may not have remembered receiving that phone call, the defense opened the door to this additional information when it posed the question. The Court did not err when it declined to strike the testimony.[151]

But even if the Court had erred, such an error was not unfairly prejudicial and would not justify a new trial. Shanholtzer's response was broad and vague, and he did not vouch for the accuracy of the information that "a lot of people" had been telling him over the phone. Further,

---

[149] Dkt. 669-1 at 288.

[150] *Id.*

[151] *Cf. United States v. Schmidt*, 572 F.2d 206, 207–08 (9th Cir. 1977) (concluding trial court did not abuse its discretion by denying a motion to declare a mistrial based on a witness's nonresponsive reference to the defendant's previous incarceration by explaining that defense counsel opened the door by asking the witness whether the defendant "sought to go to prison to escape the pressures of the outside world"); *see also* Dkt. 669-1 at 288 (the Court stated: "I'm not going to strike the answer. You asked the question if he received a call from a particular person, and he's answering you what he received").

26

given that Shanholtzer testified that Moi confessed to the murder of Andrews, this vague response alone was unlikely to have impacted the jury's verdict.

### 2.  Boothroyd's Testimony Was Properly Admitted

Separately, the Court did not err when it permitted Agent Boothroyd to testify that she had entered location coordinates from Dwiggins's cell phone record into Google to determine that Dwiggins's phone was located in Wasilla, Alaska on the night of Andrews's murder. Moi argues the Government failed to demonstrate the relevance of this testimony because Agent Boothroyd could not establish that the location coordinates used in her Google search reliably corresponded with the physical location of Dwiggins's phone.

Federal Rule of Evidence 104(b) provides "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." Pursuant to this Rule, the Government established, through the testimony of Agent Sean Kennedy, the relevance of the conditional fact that the location coordinates in Dwiggins's cell phone record reasonably corresponded to the general physical location of his phone.

The parties first stipulated to the admission of Dwiggins's cell phone record, which reflected data usage from shortly before and shortly after the murder, originating from the same GPS coordinates.[152] Then, Agent Kennedy testified about the type of location information available in call detail records. Although his testimony related to AT&T records, he explained that every cellular provider in Alaska maintains call detail records, even if "[t]hey don't all look the same."[153] Agent Kennedy also explained that location information derived from voice calls and

_____

[152] Dkt. 686 at 16 (61.512678° North by 149.650909° West).

[153] Dkt. 615 at 22.

SMS messages is a better metric for determining a phone's location than location information derived from data usage.[154] However, Agent Kennedy testified that location information from data usage would "be enough to locate a phone within a broad geographic area like a city."[155] So even though Agent Boothroyd "could not testify what the[] coordinates on the phone records represented or whether they were reliable,"[156] Agent Kennedy's testimony did.

Because the Government established the relevance of this conditional fact through Agent Kennedy's testimony, it was ultimately up to the jury, after cross-examination, to assess the reliability of Agent Boothroyd's conclusion that Dwiggins's phone was in Wasilla on the night of Andrews's murder. Because Agent Kennedy provided foundational testimony regarding the coordinates' significance and reliability, no further prejudice to the defense occurred when the Government included this information during closing. The Court therefore did not err by allowing Agent Boothroyd to testify about the location coordinates list in Dwiggins's cell phone record.

## VI.    CONCLUSION

For the foregoing reasons, Defendant Moi's Motion for New Trial at Docket 669 is **GRANTED** pursuant to Federal Rule of Criminal Procedure 33(a).

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 18th day of November, 2022.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[154] *See* Dkt. 686-1 at 135–136.

[155] *Id.* at 136–38.

[156] Dkt. 669 at 83.

28